713 So.2d 1008 (1998)
Willie MILLER, Appellant,
v.
STATE of Florida, Appellee.
No. 85744.
Supreme Court of Florida.
July 16, 1998.
Nancy Daniels, Public Defender, Second Judicial Circuit, Tallahassee, and Bill Salmon, Gainesville, for Appellant.
Robert A. Butterworth, Attorney General, and Gypsy Bailey and Mark S. Dunn, Assistant Attorneys General, Tallahassee, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing the death penalty upon Willie Miller. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const.
Miller was found guilty of all five counts charged: first-degree murder (against victim James Wallace), attempted firstdegree murder with use of a firearm (against victim James Jung), armed robbery with a firearm (against victim James Jung), burglary (including an assault while using a firearm), and robbery with a firearm (against James Wallace). On April 28, 1995, the judge sentenced Miller to death following a twelve-to-zero jury recommendation.
Miller (34 years old) and his nephew Samuel Fagin (16 years old) entered the Jung Lee grocery store at around 4:30 p.m. on July 5, 1993. Miller's brother had given *1009 them the idea to rob the store, and had given Miller and Fagin a .22 caliber rifle. James Jung (who ran the store) testified that he, both his parents (who owned the store), the store's security guard (James Wallace), Mary McGriff, and two children were inside.
Fagin testified that after entering, Miller put the rifle up to Wallace's face, then Fagin took Wallace's .38 caliber gun. Fagin said he heard a gunshot, then saw blood coming from Wallace's face. Fagin then shot James Junghe claimed accidentallywho was behind the counter. Miller took the money from the cash register. Miller and Fagin then left. Jung was hospitalized but ultimately recovered from the gunshot wound. Wallace developed other ailments during his hospitalization and died on January 1, 1994. His doctor testified that he died of pneumonia and respiratory failure; the medical examiner testified that the cause of death was a gunshot wound to the head.
Fagin testified that he and Miller split the money. Eric "Bobby" Harrison testified that he bought the .38 caliber gun from Fagin. Also testifying were: firearms experts, a fingerprint expert who testified that a print on the cash tray belonged to Miller, and several jailhouse informants who testified as to conversations with Miller where he said he had shot Wallace. Sheila Rose testified that she was across the street from the grocery when her grandmother Mary McGriff ran over and told her Wallace had been shot. Rose said she could see through the window that a man jumped across the counter and that then she saw two men exit the store. She described both men. The defense did not call any witnesses, and Miller did not testify in his own defense. The jury deliberated for approximately two hours before returning the guilty verdicts.
At the penalty phase, the State called court operations supervisor Hanzelon to testify as to Miller's prior armed robbery conviction. The State called Fertgus, who testified that the fingerprints affixed to the prior judgment matched the prints he took from Miller in 1995, and Detective Goodbred, who recounted the details of the 1984 offense. The defense called no witnesses. The jury deliberated for half an hour before returning its twelve-to-zero vote.
After submitting sentencing memoranda, the defense submitted a copy of Miller's school records at the sentencing hearing and noted that Miller had been examined by Dr. Krop and Dr. Miller. At sentencing, the defense introduced a letter from Miller's G.E.D. instructor. The court sentenced Miller to death on the first-degree murder count, finding three aggravators: prior violent felony conviction, felony murder, and pecuniary gain. The court found no statutory mitigation, but considered nonstatutory mitigation presented in the P.S.I. and defense memorandum: family background and abuse as a child. The court found that the aggravation outweighed the mitigation.
The court also sentenced Miller to life imprisonment for the attempted murder of Jung, the two counts of armed robbery, and the armed burglary (three-year minimum mandatory on the attempted murder charge based on use of a firearm). The trial court departed from the guidelines, listing as reasons the unscored capital conviction, the excessive physical trauma to the victims, and the force used in committing the robbery.
Miller raises no guilt phase issues and six penalty phase issues. He argues: (1) there was improper weighing and evaluation of mitigating evidence because the mitigation outweighed the aggravation; (2) the prosecutor's "mercy is inappropriate" comment was a misstatement of the law; (3) the victim impact evidence did not comply with section 921.141(7), Florida Statutes (1995), and should have been prohibited under Booth v. Maryland, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987); (4) the death sentence is disproportionate; (5) the sentencing order failed to expressly weigh and evaluate each mitigating circumstance; and (6) there was ineffective assistance of counsel because of failure to adequately investigate and present additional mitigation, including mental retardation, which was readily available information.
Although Miller raises no guilt phase issues, we have conducted an independent review of the entire record, and find competent and substantial evidence to support the convictions *1010 of murder, attempted murder, armed robbery, and robbery. We reverse the conviction for burglary, for the reasons expressed below. We vacate the death sentence and remand for a new sentencing proceeding.
First, we address Miller's burglary conviction. Section 810.02(1), Florida Statutes (1993), defines burglary:
Burglary means entering or remaining in a structure or a conveyance with the intent to commit an offense therein, unless the premises are at the time open to the public or the defendant is licensed or invited to enter or remain.
Here, there is no evidence that the grocery store was not open; therefore Miller was "licensed or invited to enter." In Robertson v. State, 699 So.2d 1343 (Fla.1997), we cited the Third District Court of Appeal's analysis in Ray v. State: "[Once] consensual entry is complete, a consensual `remaining in' begins, and any burglary conviction must be bottomed on proof that consent to `remaining in' has been withdrawn." Ray v. State, 522 So.2d 963, 965 (Fla. 3d DCA 1988). Miller entered the grocery store when it was open, and on this record we can find no evidence that consent was withdrawn. In arguing Miller was guilty of burglary, the State's argument for withdrawal of consent was:
As to burglary, the state must show that the defendant entered or remained in a structure owned or in the possession of James Jung, the store. Did not have the permission or consent of James Jung or anyone else authorized to allow him to come in there.
Now it's an open store, yes, at first, but you heard Mr. Bledsoe ask Mr. Jung did you give them or anyone any permission to come in your store, pull guns on you and your security guard, shoot you both and take your money and take his gun?
Well, no, of course not, so at the time they committed the crime Willie Miller was remaining in a structure and did not have the permission or consent of Mr. Jung.
During the penalty phase, when arguing for the imposition of the burglary aggravator, the State argued:
Well, you found this aggravating circumstance by your verdict three weeks ago.... Sometimes they overlap a little bit.... I submit to you that's an automatic aggravating circumstance. It really is.
There is a policy behind that, why that's an aggravating circumstance, and this is what it is: There are certain crimes that are so inherently dangerous that if somebody is killed during the course of the commission of that crime whether it be accidental or otherwise that perpetrator is going to be held accountable for it. That's felony murder.
Recall the evidence. This defendant [and] Samuel Fagin didn't go into that store to buy any goods. They went in there for one reason and that's to commit crimes, and Mr. Jung told you I didn't invite anybody in to my store to commit crimes.
That just stands to reason. My store is open to the public to come in and want to buy something, not to take my money, not to shoot me, not to shoot my friend and my security guard, James Wallace.
....
That second aggravating circumstance I submit to you once again it's automatic. You found it in your verdict three weeks ago. It's a heavy, heavy, heavy aggravating circumstance.
This is not sufficient. It is improbable that there would ever be a victim who gave an assailant permission to come in, pull guns on the victim, shoot the victim, and take the victim's money. To allow a conviction of burglary based on the facts in this case would erode the consent section of the statute to a point where it was surplusage: every time there was a crime in a structure open to the public committed with the requisite intent upon an aware victim, the perpetrator would automatically be guilty of burglary. This is not an appropriate construction of the statute.
Here, the argument was geared towards showing that Miller did not have consent to enter the grocery store to commit a crime. Clearly the store was open, so Miller entered the store legally. There was no attempt to showeven through circumstantial evidencethat *1011 although Miller entered the store legally, consent was withdrawn. There must be some evidence the jury can rationally rely on to infer that consent was withdrawn besides the fact that a crime occurred. Not only do we not find any such evidence, we note that there was none argued by the State. Accordingly, we reverse Miller's burglary conviction.
Because we reverse the burglary conviction, the "committed during the course of a burglary" aggravator is invalid. On the basis of this record, we cannot find this improper aggravator to be harmless and therefore a complete new penalty phase proceeding before a jury is required.
From our review of the record, it appears that Miller should be provided with different counsel for the new penalty phase proceeding. New counsel should be appointed within thirty days of this opinion becoming final. New counsel should be allowed reasonable opportunity to develop mitigating evidence prior to the new penalty phase proceeding.
It is so ordered.
HARDING, C.J., and OVERTON, SHAW and WELLS, JJ., concur.
ANSTEAD, J., concurs with an opinion.
ANSTEAD, Justice, concurring.
I concur in the affirmance of appellant's murder conviction and write separately to note that it is apparent from the face of the record that the penalty phase proceedings before the jury were fundamentally flawed.
We can have no confidence in the outcome of this sentencing proceeding because the defendant did not receive the competent assistance of counsel. The State candidly acknowledges in its brief that defendant's counsel called no witnesses during the penalty phase proceedings before the jury, although the record reflects the existence of extensive evidence of compelling mitigation:
The presentence investigation report reflects that Miller completed the 5th grade; that Miller never knew his father; that he was raised primarily by an aunt; that he developed behavioral problems when he lived with his mother after age 11; that Miller constantly ran away from home and became involved with "less than desirable individuals"; that Miller's mother beat Miller's twin to death in Miller's presence; that Miller entered a juvenile delinquency facility at age 13; that Miller has many brothers and sisters; that Miller claims no physical or emotional problems; that Miller changed residences many times after age 11; that Miller reported that he drinks alcoholic beverages whenever they are available; that he tried marijuana first at the age of 10; that he first used powder cocaine at the age of 20 and is addicted; and that Miller has never tried crack cocaine or drug treatment.
Dr. Miller's 1993 report opined that Miller was competent to proceed with trial and was not insane at the time of the offenses. Dr Miller concluded:
Mr. Miller will provide a challenge for his attorney. The patient does not have a mental disorder per se, b[u]t a personality at this point in time will serve him in the use of passive aggressive mechanisms. His negativism and his refusal to cooperate are the only means which he has available to him at the present time to remind him that he has any control whatsoever over his destiny. Though this, indeed, is self-defeating behavior, it does not originate on the basis of a mental disease or disorder but of a characterologic problem which in many ways is even more of an obstacle to successful adaptation than the former. No treatment is indicated, but a great deal of time and patience will be required.
Dr. Krop's 1994 evaluation revealed conflicts between Miller and defense counsel and inappropriate courtroom behavior. Despite Miller's complaints of depression, auditory and visual hallucinations, and suicidal ideation, Dr. Krop found Miller resistant to completing psychological tests, deliberate in answering questions incorrectly, and generally coherent, logical, and goal directed in his thinking. Additionally, "[a] test utilized to rule out malingering was administered and the Defendant's responses to this assessment procedure strongly suggested that he was attempting to exaggerate *1012 symptomatology and give an appearance of limited intellectual ability." See also id. ("Mr. Miller is malingering in order to avoid responsibility."). Dr. Krop concluded that Miller was legally competent to proceed, but offered no opinion as to sanity based on Miller's refusal to discuss his involvement in the instant offenses.
....
Miller also claims that his dull intelligence, substance abuse, low IQ, and mental retardation all point to statutory mitigation. This argument, however, assumes Miller has no responsibility for presenting mitigation. Case law from this Court holds to the contrary. Lucas, 613 So.2d at 410; Mikenas v. State, 367 So.2d 606, 610 (Fla.1978) ("It is not the function of this Court to cull through what has been listed as aggravating and mitigating circumstances in the trial court's order, determine which are proper for consideration and which are not...."). Had Miller considered these mitigating factors so noteworthy during the penalty phase, he had every opportunity to present additional evidence in support of them. In any event, to the extent that these factors existed, the trial court considered them via the school records, the PSI, and the medical reports.
Regarding retardation, intelligence, and low IQ, it is important to recognize that, while the school records refer to retardation, they
didn't say that [Miller] was quote retarded or that he had any kind of organic disfunction or his brain didn't work, just rather that he was functioning in that retarded intellectual level and where they get that from is the plain fact he just ... couldn't do the work because he never tried to do the work. He never applied himself.

Compare Martin v. State, 515 So.2d 189 (Fla.1987); Martin v. State, 455 So.2d 370 (Fla.1984). The school records also show that Miller did not accept responsibility for his actions, was mean, could not get along with others, and was a bully. These records, prepared in 1977 when Miller was 17 years old, also conflict with the more recent reports provided by Drs. Miller and Krop, who found no evidence of retardation or any mental impairment.
Regarding substance abuse, the school records mentioned only that Miller, on the day of testing, "smelled rather strongly of alcohol and his eyes were somewhat bloodshot." They do not refer to a longstanding problem. Miller, however, told the PSI preparer that he drinks alcoholic beverages when they are available, began using marijuana when he was 10 years old, began using powdered cocaine when he was 20, and was addicted to powdered cocaine. Critically, there is no report that he was drunk or high at the time of the instant offenses. See Cook v. State, 542 So.2d 964, 971 (Fla.1989). Under such circumstances, the trial court committed no error in considering, but not finding, this mitigating circumstance. See Duncan v. State, 619 So.2d 279, 283-84 (Fla.1993); Mason v. State, 438 So.2d 374, 379 (Fla.1983).
(Answer Brief of Appellee at 14-19) (citations to record omitted) (footnote omitted). This discussion by the State clearly demonstrates the existence of extensive mitigation that was not presented to the sentencing jury. As the State argues, "[h]ad Miller considered these mitigating factors [of dull intelligence, substance abuse, low IQ, and mental retardation] so noteworthy during the penalty phase", he should have presented them to the jury. Of course, that is the essential point: competent counsel for Miller should have and would have exhaustively investigated, and then presented the extensive evidence of mitigation that we all know exists.
Our reversal and remand hopefully will result in a fair proceeding where the jury and judge are presented with all of the available evidence of mitigation and both sides receive vigorous and professional representation.