753 So.2d 9 (2000)
Michael Duane ZACK, III, Appellant,
v.
STATE of Florida, Appellee.
No. SC92089.
Supreme Court of Florida.
January 6, 2000.
Rehearing Denied March 20, 2000.
*12 Nancy A. Daniels, Public Defender, and David A. Davis, Assistant Public Defender, Second Judicial Circuit, Tallahassee, Florida, for Appellant.
Robert A. Butterworth, Attorney General, and Sara D. Baggett, Assistant Attorney General, West Palm Beach, Florida, for Appellee.
PER CURIAM.
We have on appeal the judgment and sentence of the trial court imposing the death penalty upon Michael Duane Zack, III. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const.
On June 16, 1996, the Escambia County Sheriff's Office arrested Michael Duane Zack (Zack) for the sexual assault, robbery, and first-degree murder of Ravonne Kennedy Smith (Smith). Zack, who was twenty-seven at the time of these crimes, was indicted by the grand jury on June 25, 1996. A jury trial was commenced before the Honorable Joseph Q. Tarbuck on September 8, 1997, and guilty verdicts on all counts were returned by the jury on September 15, 1997. In the penalty phase held October 14-17, 1997, the reconvened jury recommended a sentence of death by a vote of eleven to one. The trial court followed the jury's recommendation and on November 14, 1997, sentenced Zack to death.
In support of the death sentence, the trial judge found the following six aggravating circumstances: (1) the defendant was convicted of a capital felony while under a sentence of felony probation; (2) the crime was committed in conjunction with a robbery, sexual battery, or burglary; (3) the *13 defendant committed the crime to avoid lawful arrest; (4) the defendant committed the crime for financial gain; (5) the crime was especially heinous, atrocious, and cruel; and (6) the crime was committed in a cold, calculated, and premeditated manner. The trial court found that the following four mitigating circumstances were entitled to little weight: (1) the defendant committed the crime while under an extreme mental or emotional disturbance; (2) the defendant was acting under extreme duress; (3) the defendant lacked the capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law; and (4) nonstatutory mitigating factors of remorse, voluntary confession, and good conduct while incarcerated. Zack's age was not considered a mitigating factor. A timely notice of appeal was filed on December 18, 1997.
Although the murder of Smith took place on June 13, 1996, the chain of events which culminated in this murder began on June 4, 1996, when Edith Pope (Pope), a bartender in Tallahassee, lent her car to Zack. In the weeks prior, Zack had come to Pope's bar on a regular basis. He generally nursed one or two beers and talked with Pope; she never saw him intoxicated. He told her that he had witnessed his sister murder his mother with an axe. As a result, Pope felt sorry for Zack, and she began to give him odd jobs around the bar. When Zack's girlfriend called the bar on June 4 to advise him that he was being evicted from her apartment, Pope lent Zack her red Honda automobile to pick up his belongings. Zack never returned.
From Tallahassee, Zack drove to Panama City where he met Bobby Chandler (Chandler) at a local pub. Over the next several days, Zack frequented the pub daily and befriended Chandler.[1] Chandler, who owned a construction subcontracting business, hired Zack to work in his construction business. When Chandler discovered that Zack was living out of a car (the red Honda), he invited Zack to live with him temporarily. On the second night at Chandler's, Zack woke up screaming following a nightmare. Chandler heard Zack groan words which sounded like "stop" or "don't." Although Chandler questioned him, Zack would not discuss the nightmare. Two nights later, on June 11, 1996, Zack left Chandler's during the night, stealing a rifle, a hand gun, and forty-two dollars from Chandler's wallet. Zack drove to Niceville, and on the morning of June 12, 1996, pawned the guns for $225.
From Niceville, Zack traveled to Okaloosa County and stopped at yet another bar. At this bar, Zack was sitting alone drinking a beer when he was approached by Laura Rosillo (Rosillo). The two left the bar in the red Honda and drove to the beach, reportedly to use drugs Zack said he possessed. Once on the beach, Zack attacked Rosillo and beat her while they were still in the Honda. He then pulled Rosillo from the car and beat her head against one of the tires. Rosillo's tube top was torn and hanging off her hips. Her spandex pants were pulled down around her right ankle. The evidence suggests she was sexually assaulted; however, the sperm found in Rosillo's body could not be matched to Zack. He then strangled her, dragged her body behind a sand dune, kicked dirt over her face, and departed.
Zack's next stop on this crime-riddled journey was Dirty Joe's bar located near the beach in Pensacola. He arrived there on the afternoon of June 13, 1996, and met the decedent, Ravonne Smith. Throughout the afternoon, Smith, a bar employee, and Zack sat together in the bar talking and playing pool or darts. The bar was not very busy, so Smith spent most of her time with Zack. Both bar employees and patrons testified that Zack did not ingest *14 any significant amount of alcohol and that he did not appear to be intoxicated. In the late afternoon, Smith contacted her friend Russell Williams (Williams) and invited him to the bar because she was lonely. Williams arrived at the bar around 5:30 p.m. Prior to leaving the bar around 7 p.m., Smith called her live-in boyfriend, Danny Schaffer, and told him she was working late. Smith, Williams, and Zack then left the bar and drove to the beach where they shared a marijuana cigarette supplied by Zack. Afterwards, they returned to the bar and Williams departed. Zack and Smith left the bar together sometime around 8 p.m. and eventually arrived at the house Smith shared with her boyfriend.
Forensic evidence indicates that immediately upon entering the house Zack hit Smith with a beer bottle causing shards of glass and blood to spray onto the living-room love seat and two drops of blood to spray onto the interior door frame. Zack pursued Smith down the hall to the master bedroom leaving a trail of blood. Once in the bedroom Zack sexually assaulted Smith as she lay bleeding on the bed. Following the attack Smith managed to escape to the empty guest bedroom across the hall. Zack pursued her and beat her head against the bedroom's wooden floor. Once he incapacitated Smith, Zack went to the kitchen where he got an oyster knife. He returned to the guest bedroom where Smith lay and stabbed her in the chest four times with the knife. The four wounds were close together in the center of Smith's chest. Zack went back to the kitchen, cleaned the knife, put it away, and washed the blood from his hands. He then went back to the master bedroom, placed Smith's bloody shirt and shorts in her dresser drawer, stole a television, a VCR, and Smith's purse, and placed the stolen items in Smith's car.
During the night, Zack drove Smith's car to the area where the red Honda was parked. He removed the license plate and several personal items from the Honda then moved it to a nearby lot. Zack returned to Panama City in Smith's car and attempted to pawn the television and VCR. Suspecting the merchandise was stolen, the shop owners asked for identification and told Zack they had to check on the merchandise. Zack fled the store and abandoned Smith's car behind a local restaurant. Zack was apprehended after he had spent several days hiding in an empty house.
After he was arrested, Zack confessed to the Smith murder and to the Pope and Chandler thefts. Zack claimed he and Smith had consensual sex and that she thereafter made a comment regarding his mother's murder. The comment enraged him, and he attacked her. Zack contended the fight began in the hallway, not immediately upon entering the house. He said he grabbed a knife in self-defense, believing Smith left the master bedroom to get a gun from the guest bedroom.[2]
The defense additionally contended that Zack suffers from fetal alcohol syndrome (FAS) and posttraumatic stress disorder (PTSD). Thus, the defense postulated Zack was impulsive, under constant mental and emotional distress, and could not form the requisite intent to commit premeditated murder. The State's theory of the case was that Zack was a calculated stalker/predator, who stalked his prey in bars. His method of operation included befriending his prey, gaining each person's sympathy with stories of his mother's death and his abusive childhood, then taking advantage of the persons by either robbing or sexually assaulting them.
After the jury returned verdicts of guilty for first-degree murder, sexual battery and robbery, a second phase was commenced to determine the appropriate punishmentdeath or life in prison. The defense presented expert witnesses who discussed Zack's mental and emotional health. Dr. William Spence, a forensic *15 psychologist, evaluated Zack in Tallahassee after he had been arrested for grand theft of an automobile. Dr. Spence diagnosed Zack with posttraumatic stress disorder. He admitted the social history was given to him by Zack, who claimed to have witnessed his sister murder his mother. Dr. James Larson, Dr. Barry Crown, and Dr. Michael Maher evaluated Zack and investigated his social history. Each of them also diagnosed Zack as suffering from posttraumatic stress disorder and fetal alcohol syndrome. They further opined that the murder was committed while Zack was under an extreme mental or emotional disturbance and that Zack's ability to appreciate the criminality of his conduct was substantially impaired. None of them had spoken with anyone who had contact with Zack around the time of the murder.
In addition to experts, Zack presented the testimony of friends and family. The defendant's father testified that he met and married Zack's mother when she was pregnant with Zack. He divorced her because of her excessive drinking. Zack's maternal grandmother testified about his mother's marriage and divorce from Zack's father and her marriage to Anthony Midkiff when Zack was two years old. The grandmother stated she never saw or heard of Midkiff abusing Zack. Theresa McEwing,[3] Zack's stepsister, testified that Midkiff punished Zack when he wet the bed. The punishment would take the form of burning Zack's "privates" with a heated spoon, fashioning an electric blanket to electrocute Zack if the blanket got wet, or pulling hard on Zack's penis.
Ziva Knight,[4] Midkiff's daughter, testified concerning Midkiff's extensive abuse of Zack. Zack's aunt, Ione Tanner, also related instances of abuse of Zack by Midkiff. She admitted she did not get medical attention for Zack nor did she report the abuse. The State demonstrated that she knew, from defense counsel, that the experts would rely on allegations of abuse in formulating their opinions. Phyllis Anglemyer, a friend of Zack's mother, related instances of abuse by Midkiff committed in her presence. However, her husband, who observed Midkiff interact with Zack on a daily basis for five years, only witnessed one instance of abuse. Richard Enfield, a correctional officer, testified that while awaiting trial, Zack volunteered to assist in a project dealing with juvenile delinquents. Enfield said he stopped using Zack in the program after Zack attacked a jail guard.
The State, during its initial penalty phase presentation, elicited testimony from Donald Steeley, a probation officer from Oklahoma, that Zack was an absconder from probation. The State also presented testimony from Smith's mother and two brothers. On rebuttal, the State offered testimony from Dr. Eric Mings, Dr. Harry McClaren and Candice Fletcher, Zack's former girlfriend and mother of his child. Dr. Mings, a neuropsychologist, stated Zack has a full scale I.Q. of 86in the low average range. He could not diagnose Zack with fetal alcohol syndrome because there were too many variables. Mings also stated that neuropsychological testing cannot be used by itself to diagnose posttraumatic stress disorder. Dr. McClaren, a forensic psychologist, who also testified in the guilt phase of the trial, indicated he administered the MMPI to Zack, but the malingering scale was outside of the normal limits, making the test useless. Dr. McClaren opined, after interviews with persons who had contact with Zack around the time of the murder, that the statutory mental mitigators did not apply and that Zack's actions around the time of the murder were more planned than spontaneous.

*16 Williams Rule Evidence

On appeal, Zack challenges both his conviction and his death sentence, raising twelve issues in all.[5] The first issue involves the propriety of admitting evidence of the other crimes Zack committed during the two-week period prior to this murder. Zack argues the trial court erred in admitting evidence of the theft of guns and money from Chandler and evidence of the murder and sexual assault of Rosillo because these crimes were not sufficiently similar to the crimes charged, did not prove intent or disprove voluntary intoxication, were not inextricably intertwined, and became a feature of the trial. We disagree. The trial court did not err in admitting this evidence because it was relevant as part of a prolonged criminal episode demonstrating Zack's motive, intent, modus operandi and the entire context from which this murder arose. See Heiney v. State, 447 So.2d 210 (Fla.1984).
In Williams v. State, 110 So.2d 654 (Fla. 1959), this Court reiterated the standard rule for admission of evidence; that is, that any evidence relevant to prove a material fact at issue is admissible unless precluded by a specific rule of exclusion. See § 90.402, Fla. Stat. (1995). The Court also said relevant evidence will not be excluded merely because it relates to facts that point to the commission of a separate crime, but added the caveat that "the question of the relevancy of this type of evidence should be cautiously scrutinized before it is determined to be admissible." 110 So.2d at 662. This rule concerning the admissibility of similar fact evidence has been codified by the Legislature as section 90.404(2), Florida Statutes (1995).
Later, in Bryan v. State, 533 So.2d 744 (Fla.1988), we made it clear that the admissibility of other crimes evidence is not limited to crimes with similar facts. We stated that similar fact evidence may be admissible pursuant to section 90.404, and other crimes or bad acts that are not similar may be admissible under section 90.402. We reiterated the distinction between "similar fact" evidence and "dissimilar fact" evidence in Sexton v. State, 697 So.2d 833, 837 (Fla.1997).
Thus, section 90.404 is a special limitation governing the admissibility of similar fact evidence. But if evidence of a defendant's collateral bad acts bears no logical resemblance to the crime for which the defendant is being tried, then section 90.404(2)(a) does not apply and the general rule in section 90.402 controls. A trial court has broad discretion in determining the relevance of evidence and such a determination will not be disturbed absent an abuse of discretion. Heath v. State, 648 So.2d 660, 664 (Fla. 1994).
Thus, whether the evidence of other bad acts complained of by Zack is termed "similar fact" evidence or "dissimilar fact" evidence, its admissibility is determined by its relevancy. The trial court must utilize a balancing test to determine if the probative value of this relevant evidence is outweighed by its prejudicial effect. See § 90.403, Fla. Stat. (1995); Gore v. State, 719 So.2d 1197 (Fla.1998).
*17 The facts and circumstances of this case clearly show that the trial court correctly struck that balance in favor of admissibility because the evidence of the crimes against Chandler and Rosillo demonstrated Zack's common scheme and method of operation; this evidence helped to put the present case in perspective. The evidence of the Rosillo murder also casts light on Zack's motive, intent and the timing of the Smith assault. The evidence surrounding the other bad acts Zack committed, beginning with Pope theft[6] and culminating with the Smith murder, clearly demonstrates that he found his victims at bars, befriended them, gained their trust or sympathy, and thereafter committed some criminal act on or against them. Thus, the circumstances of the charged offenses were not happenstance but a series of calculated actions on the part of the defendant. Although this evidence is undeniably prejudicial to the defendant, its probative value outweighs the prejudicial effect.
This case is similar to the situation addressed by this Court in Wuornos v. State, 644 So.2d 1000 (Fla.1994). Wuornos was charged with the first-degree murder of a man who picked her up while she was hitchhiking. At trial she attempted to portray herself as the victim. She said the decedent viciously abused her both vaginally and anally and engaged in conduct indicative of an intent to kill her. Thus, she claimed to have acted in either self-defense or without an intent to kill. The State was allowed to introduce evidence of other crimes to rebut Wuornos' claim of lack of intent or self-defense. We held, "[T]his was a proper purpose under the Williams rule." Id. at 1007. Similarly, in the instant case, Zack argues he did not attack Smith upon entry into the house, and that he only retrieved the knife from the kitchen to protect himself. The State's use of the Williams rule evidence to rebut these assertions was valid and demonstrates the evidence was not introduced solely to show propensity.
Further, we do not agree that the Williams rule evidence became a feature of the trial or that the evidence was not relevant to the issue of intoxication. Two of the defenses offered by Zack were voluntary intoxication and fetal alcohol syndrome. Zack maintained that he could not form the requisite intent to commit either first-degree murder or robbery. Zack's minimal ingestion of alcohol during these other criminal episodes was relevant to these claimed defenses. Unlike the case of Steverson v. State, 695 So.2d 687 (Fla. 1997), where this Court reversed a conviction based on the admission of extensive details of a collateral crime which focused on the injuries and recovery of a police officer, the evidence presented in this case was necessary to rebut the defenses offered and to piece together the sequence of events leading up to this murder. Although several witnesses testified to facts surrounding the Chandler and Rosillo incidents, each piece of evidence helped to paint a clear picture of the defendant in these bar settings, pieces of evidence that led to the conclusion that Zack did not drink excessively. The Williams rule evidence was relevant and was not excessive under the circumstances of this case.

Sexual Battery
Zack next argues the trial court should have granted his motion for judgment of acquittal on the sexual battery charge. A motion for judgment of acquittal should only be granted if there is no view of the evidence from which a jury could make a finding contrary to that of the moving party. See Lynch v. State, 293 So.2d 44 (Fla.1974). Additionally, in a circumstantial evidence case, the State's evidence must be not only consistent with guilt but inconsistent with any reasonable hypothesis of innocence. See Benedith v. *18 State, 717 So.2d 472 (Fla.1998). While Zack admits that he killed Smith, his reasonable hypothesis of innocence which would preclude first-degree murder was that he had consensual sex with the victim, that her clothing was torn during rough foreplay, and that the stabbing was in self-defense.
We affirm the trial court's denial of Zack's motion because the State presented evidence from which a reasonable jury could conclude that Zack attacked the victim as soon as they entered her house and sexually assaulted her while she was in a weakened condition. Although there is evidence from which a jury could conclude that Smith originally intended to engage in consensual intercourse with Zack, such evidence does not negate the expert's opinion, based on the blood evidence and the other physical evidence in the living room, that the assault began as soon as Smith and Zack entered the house.

Robbery
Next, Zack argues that the trial court erred in denying his motion for a judgment of acquittal on the robbery charge because the theft was an afterthought and not part of the murder. We disagree. Relying on Mahn v. State, 714 So.2d 391 (Fla.1998), Zack claims that the evidence supports his claim that the theft in this case was not premeditated. However, the evidence of premeditation in this case is far more convincing than the evidence in Mahn. The evidence in this case strongly suggests that the attack began immediately upon entering Smith's house. Following the rape and murder, Zack remained in the house and stole easily pawnable items. This theft is similar to the other deliberate thefts Zack perpetrated during his crime spree. In his other thefts Zack took advantage of his victims by gaining their sympathy and then stealing items which he could easily pawn, thereby ensuring his continued financial support. Consistent with this pattern, following Smith's murder, Zack immediately drove to a pawn shop in Panama City to exchange the stolen items for cash.
This same motivation explains the theft of Smith's car. Zack was aware that Pope had reported the red Honda stolen and that the license plate would connect him to its theft and, possibly, to his other crimes. He was also aware that he would need a vehicle to leave the scene of Smith's homicide. This vehicle would be useful in carrying away the items he intended to steal and pawn. Thus, the theft of Smith's car was a part of Zack's plan. This evidence of premeditation supports the State's theory of the case and negates Zack's reasonable hypothesis of innocencethat the thefts were an afterthought brought about by panic following the Smith murder. See Barwick v. State, 660 So.2d 685 (Fla.1995).

Burglary
The fourth issue in this appeal is a challenge to the trial court's instruction that Zack could be convicted of felony murder based upon the predicate felony of burglary. Zack relies on Miller v. State, 713 So.2d 1008 (Fla.1998), to argue that Smith consented to his entry into her house and that his attack on Smith, standing alone, was insufficient to revoke that consent. Thus, he contends that absent the State's proof that Smith withdrew her consent, the instruction regarding felony murder based on burglary was improper. We disagree.
The crux of our decision in Miller was the open nature of public structures, such as the grocery store in that case. This fact was made clear in our revised opinion. See Miller v. State, 733 So.2d 955 (Fla. 1998).[7] Thus, in this case, where a private home is involved, the basis for the Miller decision is inapplicable.
Zack was neither charged with nor convicted of burglary. He was, however, convicted of both sexual battery and robbery. *19 As we previously indicated, there is ample evidence to support both felony convictions, and there is ample evidence to support first-degree murder felony murder based on commission of these felonies or first-degree murder based on premeditation. Thus, even if the giving of an instruction on burglary was error, the error was harmless beyond a reasonable doubt. As the State points out, both a conviction for first-degree murder and the felony murder aggravator can be sustained based on the sexual battery or robbery conviction. And based on the strength of the State's case, there is no reasonable possibility that either the conviction or the sentence would have been different but for the argument and instruction on burglary.

Mitigation
In his fifth point on appeal, Zack questions the sufficiency of the court's consideration of his mitigation evidence. This point is without merit because the record demonstrates that the trial court considered and weighed each of the mitigating circumstances offered by the defense. During the penalty phase, Zack presented evidence in support of several mitigating factors: (1) Defendant committed the crime while under an extreme mental or emotional disturbance;[8] (2) Defendant was acting under extreme duress; (3) Defendant lacked the capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law; (4) Nonstatutory factors: remorse, voluntary confession, good conduct while incarcerated.
As a matter of law, the court cannot refuse to consider relevant mitigating factors. In Campbell v. State, 571 So.2d 415 (Fla.1990), this Court said:
When addressing mitigating circumstances, the sentencing court must expressly evaluate in its sentencing order each mitigating circumstance proposed by the defendant to determine whether it is supported by the evidence and whether, in the case of nonstatutory factors, it is truly of a mitigating nature. See Rogers v. State, 511 So.2d 526 (Fla. 1987), cert. denied, 484 U.S. 1020, 108 S.Ct. 733, 98 L.Ed.2d 681 (1988). The court must find as a mitigating circumstance each proposed factor that is mitigating in nature and has been reasonably established by the greater weight of the evidence....
Id. at 419 (footnotes omitted). However, whether a mitigating factor has been proven by the evidence is a question of fact subject to the competent substantial evidence standard. See Cave v. State, 727 So.2d 227 (Fla.1998). The record shows the defense offered evidence in support of the three statutory mental mitigators and the nonstatutory mitigators found by the trial court. The State offered evidence to rebut these mitigating factors. A review of the sentencing order indicates the trial court properly considered all of the evidence and made a determination concerning the weight to be given to each factor. The trial court resolved the conflicts in the evidence regarding the statutory and nonstatutory mitigators against Zack, finding *20 the State's witnesses more credible and compelling. This weighing of the mitigating evidence was a proper exercise of the trial court's authority. See Campbell, 571 So.2d at 420. The trial court's decision to give the mitigating factors little weight under the facts and circumstances of this case is supported by the record.
Zack also argues that the trial court failed to identify and consider in its sentencing order a list of other factors that were relevant as mitigating evidence, such as: (1) Zack's brain damage; (2) Zack's skewed perception of reality; (3) Zack's mental hospitalization when he was eleven years old; (4) Zack's dysfunctional family; (5) Zack's mental age of fifteen years and emotional maturity of ten years; (6) Zack's alcohol and marijuana addiction; and (7) Zack's tragic childhood. A review of the sentencing order demonstrates these factors were discussed and referenced in the evidence and the factors set forth in the order.

AggravatorAvoiding Lawful Arrest
Zack next argues that the State failed to prove he killed Smith to avoid being arrested. We agree, but find the error harmless. Application of the "avoiding lawful arrest" aggravator requires strong proof that the dominant motive for the murder was witness elimination. See Mahn v. State, 714 So.2d at 402. This aggravator has been applied to cases in which the evidence supported a finding that the victim would have summoned the authorities and in cases where the defendant had expressed an apprehension regarding arrest. See, e.g., Sliney v. State, 699 So.2d 662 (Fla.1997)(aggravator justified where defendant testified that his accomplice told him that "Sliney would have to kill the victim because `[s]omebody will find out or something'"); Peterka v. State, 640 So.2d 59 (Fla.1994)(aggravator applicable where defendant, who feared incarceration, had established a new identity which the victim threatened to expose).
Evidence of a desire to eliminate a witness is not present in the instant case. While it is true that Smith was able to identify Zack, this alone is insufficient to support application of this aggravator. See Consalvo v. State, 697 So.2d 805 (Fla. 1996). The record suggests only that Smith's murder was part of Zack's premeditated plan to kill her and take her car and possessions. While it is true that Zack did not have to murder Smith to accomplish his monetary goals, this alone does not make Zack's dominant motive the desire to avoid arrest.
Although the application of the "avoiding lawful arrest" aggravator is error, it is harmless error. Several other aggravating factors support imposition of the death penalty. Reversal of Zack's sentence is required only if this Court cannot find the error harmless beyond a reasonable doubt. If there is no reasonable possibility that the error contributed to the sentence, the Court should affirm. See State v. DiGuilio, 491 So.2d 1129, 1138 (Fla.1986). We find that there is no reasonable possibility that the error contributed to the sentence because without this aggravating factor there are at least four[9] other valid aggravators: prior violent felonies; pecuniary gain; heinous, atrocious, and cruel; and cold, calculated, and premeditated.

AggravatorCold, Calculated and Premeditated
In support of his seventh claim on appeal, Zack argues that his actions were impulsive rather than premeditated, making application of the cold, calculated, and premeditated (CCP) aggravator error. We reject this contention. As we previously discussed, the evidence supports the finding that Zack's actions were part of a *21 preconceived plan. Zack spent most of the day in Smith's companyfirst visiting at the bar, then briefly journeying to the beach and ultimately accompanying Smith to her home where he attacked her immediately upon entry. Zack pursued Smith through the house, first beating her, then raping her. He ultimately ceased his attack to retrieve a knife from the kitchen, which he then used to repeatedly stab Smith while she lay incapacitated on the floor. He tidied the murder scene and selected the items he intended to steal. "The lengthy and drawn out nature of this crime clearly indicates [the defendant] carefully contemplated his actions prior to the fatal incident." Fennie v. State, 648 So.2d 95, 99 (Fla.1994).
Evidence of Zack's deliberate cruelty in ceasing his attack upon Smith to obtain a knife establishes this statutory aggravator beyond a reasonable doubt and justifies the trial court and the jury's rejection of Zack's "impulse" argument to the contrary. See Wuornos, 644 So.2d at 1008; Alston v. State, 723 So.2d 148 (Fla.1998).
Additionally, Zack's previous crimes have to be considered as a factor indicating his premeditation of the Smith crimes. Zack knew that he had committed theft, rape, and murder and that he needed money and a car to escape from the area. These factors suggest that Zack formulated a plan to get those things from Smith. In order to do so, he worked throughout the day to gain her trust. Having obtained this trust, Zack exploited it to his own ends. This "deliberate ruthlessness" satisfies the heightened premeditation required in cold, calculated, and premeditated cases. Wuornos, 644 So.2d at 1008-09. Any pretense of legal justification, that Zack acted in self-defense because he believed Smith was trying to obtain a gun, is belied by the evidence that Smith was attacked immediately upon entering the home and that she was incapacitated on the guest room floor when Zack got the knife.
Zack argues that he was incapable, due to his alcohol and drug use as well as other mental deficiencies, of coldly plotting to commit a premeditated act. Yet, the circumstances of this crime demonstrate the fallacy of such a conclusion and support the trial court's rejection of this argument. Zack had a well-planned method of operation. He frequented bars and managed to be befriended by either an employee or a patron. He used the embellished facts of his mother's death and his troubled childhood to invoke sympathy from his victims. Once that sympathy was aroused, he "rewarded" the victims' kindnesses with acts of theft, rape, robbery, or murder. Those persons who observed Zack prior to and subsequent to each of his criminal episodes indicated that he consumed very little alcohol or drugs and did not appear intoxicated. This evidence, as well as the evidence from the state's mental health experts and all reasonable inferences therefrom, proves beyond a reasonable doubt that Zack committed this murder in a cold, calculated, and premeditated manner. See Suggs v. State, 644 So.2d 64 (Fla.1994)(cold, calculated, and premeditated aggravating factor affirmed where victim was taken to secluded area and repeatedly stabbed); Hall v. State, 614 So.2d 473 (Fla.1993) (evidence that defendant abducted, raped, beat, and finally killed the victim supported cold, calculated, and premeditated aggravating factor).

Victim Impact Testimony
In his eighth point on appeal, Zack objects to the use of the victim impact statement in support of the imposition of the heinous, atrocious, and cruel aggravator. The mother's statement concerning her daughter, while discussed in the context of this aggravating factor, was not used to support the aggravating factor; the testimony merely demonstrated the effect that Zack's wicked attack had on the family. We find that this aggravating factor was warranted and properly found by the trial court. In support of that aggravator, the trial court found:

*22 The Defendant's actions leading up to the crimes were undisputedly wicked inasmuch as the evidence is clear that the Defendant gained the confidence and trust of the victim thereby securing an invitation into the victim's home and once inside the home the attack on the victim began. She was beaten about the head with a beer bottle shortly after entering the home. She either ran or crawled or was dragged down the hallway while bleeding. Her clothes and underwear were ripped from her and she was forced onto her own bed where she was raped and where she left a large amount of blood, and then either escaped or was dragged into the vacant bedroom where she was beaten into unconsciousness following the rape in her bedroom. Her head was slammed against the floor a number of times and, probably, her face was either slammed into the floor or beaten with the Defendant's fists. Then, the victim was killed for the reasons aforesaid.
The mother of the victim testified that for a long time after her daughter's death she did not believe her daughter was dead and when a knock came upon her door she rushed to the door thinking that it might be her daughter returning home. The reason for this disbelief was when she was taken to identify her daughter she was unable to do so by looking at her daughter's face. The victim was brutally beaten about her face and there were a number of stab or cuts about her neck.
Zack argues that this testimony was not intended to convey that the victim's face was unrecognizable. However, given the extensive testimony regarding the injuries to the victim's head as a result of the attack, the trial court's interpretation of the mother's testimony was reasonable. The medical evidence showed that Smith had wounds about her face, neck, head, and chest. She had linear marks around her neck. She had extensive bruising around her eyes, which is characteristic of a head injury, and bruises around her lips, nose and cheek. The police testimony also confirmed that Smith was bleeding extensively and had been beaten about the head. This evidence, without reference to the mother's statement, clearly shows that this murder was "the conscienceless or pitiless crime which is unnecessarily torturous to the victim." State v. Dixon, 283 So.2d 1, 9 (Fla.1973). Use of the mother's testimony as illustrative of the viciousness of Zack's attack was not error.
Zack also argues that the State erred during closing argument by advising the jury that it could give the victim impact testimony whatever weight it felt appropriate; thus it could consider that testimony as other aggravating evidence. This argument, however, takes the prosecutor's statement out of context and gives it a skewed interpretation. The prosecutor argued this murder resulted in two tragedies, one for the victim's family and one for the defendant's family. The prosecutor reminded the jury that it had heard from the victim's family, and he explained why that evidence was presented.
What that evidence was designed to show you and demonstrate to you, that this woman was unique, that she was loved, and that her loss is a loss to this community. That's what that evidence is. That this is just not some unnamed face. That there were people who loved and cared about her. And that the community is less now that we don't have her. You'll give that weight whatever you feel is appropriate, but you are entitled to hear that.
There is no suggestion here that this evidence, in and of itself, showed another aggravating factor. Moreover, this issue is not properly before this Court since no objection was made in the trial court. See Steinhorst v. State, 412 So.2d 332 (Fla. 1982).

Rebuttal Testimony
Zack also objects to Candice Fletcher's testimony concerning Zack's relationship *23 with his stepfather, Midkiff. We find no merit in these arguments. Zack objects to Fletcher's testimony that it was Midkiff who severed his relationship with Zack after Zack stole money from him, arguing the testimony was improper bad character evidence. Throughout the trial Zack used his poor relationship with Midkiff as one of the bases for his personality disorders. Thus, the issue of Zack's relationship with his stepfather was introduced by the defense, and the State was entitled to rebut Zack's allegations with evidence of the character of the relationship between the two men. See Johnson v. State, 660 So.2d 637 (Fla.1995).
Fletcher also testified concerning her opinion of Zack's relationship with Midkiff. She responded affirmatively when asked if the relationship "was one that you would expect between a stepfather and his son." Lay opinion is proper pursuant to section 90.701, Florida Statutes (1995), when:
(1) The witness cannot readily, and with equal accuracy and adequacy, communicate what he or she has perceived to the trier of fact without testifying in terms of inferences or opinions and the witness's use of inferences or opinions will not mislead the trier of fact to the prejudice of the objecting party; and
(2) The opinions and inferences do not require a special knowledge, skill, experience, or training.
The testimony in this case was proper lay opinion testimony. Fletcher testified as to her impression of Zack's relationship with Midkiff after observing them interact over time. Testimony of this type does not require an expert witness. See Shiver v. State, 564 So.2d 1158 (Fla. 1st DCA 1990).
Lastly, Fletcher testified that a treatment center in Oklahoma "wouldn't have anything to do" with Zack because he "wouldn't conform to any treatment program." To the extent that this testimony was hearsay, it was admissible in the penalty phase so long as the defendant had a fair opportunity to rebut it. See § 921.141(1), Fla. Stat. (1995); Mendoza v. State, 700 So.2d 670 (Fla.1997). The only issue, therefore, that is before this court is whether Zack had an opportunity to rebut this testimony. See Buenoano v. State, 527 So.2d 194 (Fla.1988). We find that there was a fair opportunity to rebut this testimony. Zack had an opportunity to cross-examine Fletcher. See Damren v. State, 696 So.2d 709, 713 (Fla.1997). Further, he could have introduced testimony or documents from the Oklahoma facility as to the existence of and the reason for its break with Zack. See Long v. State, 610 So.2d 1268 (Fla.1992). Admission of Fletcher's testimony was not error.

Sympathy
At trial, Zack sought an instruction regarding the role of sympathy in the deliberative process. Zack concedes that "[t]his Court has ... consistently rejected arguments similar to the one Zack raises here." Hunter v. State, 660 So.2d 244 (Fla.1995); Hitchcock v. State, 578 So.2d 685 (Fla.1990), vacated on other grounds, 505 U.S. 1215, 112 S.Ct. 3020, 120 L.Ed.2d 892 (1992). However, in his tenth point on appeal, Zack calls on us to reconsider this precedent. We decline to recede from these decisions.
Our decisions in Hitchcock and Hunter were based upon the clear holding in Saffle v. Parks, 494 U.S. 484, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990). In Parks, the Court specifically rejected an argument identical to the one urged in this case, that the jury would erroneously disregard any mitigating evidence which evoked its sympathy once instructed that it could not consider sympathy in its deliberations. Id. at 492, 110 S.Ct. 1257. In rejecting Park's argument, the Supreme Court noted:
This argument misapprehends the distinction between allowing the jury to consider mitigating evidence and guiding their consideration. It is no doubt constitutionally permissible, if not constitutionally required, or the State to insist *24 that "the individualized assessment of the appropriateness of the death penalty [be] a moral inquiry into the culpability of the defendant, and not an emotional response to the mitigating evidence."
Id. at 492-93, 110 S.Ct. 1257 (citations omitted). The trial court properly rejected Zack's proposed sympathy instruction.
Further, a review of this record in light of Parks convinces us that the State's argument[10] concerning sympathy was a proper admonition for the jurors to consider the mitigation evidence without resort to their emotions.

AggravatorFelony Probation
In October of 1996, the Legislature amended section 921.141(5), Florida Statutes, making the commission of murder by a defendant on felony probation an aggravating factor. In his eleventh issue on appeal, Zack argues that this aggravator cannot be retroactively applied to him. In light of the distinctions we have previously made between probation and community control, we agree.
Retroactive application of a statute is generally prohibited unless the statute expressly indicates it is intended to be so applied or it is merely a procedural or remedial change. See Arrow Air, Inc. v. Walsh, 645 So.2d 422 (Fla.1994). In this instance, the 1996 amendment to the statute includes probation on the list of prison equivalents for which the aggravator "under sentence of imprisonment" might be applied. Previously, this court upheld the retroactive application of the amendment adding commission of a crime while on community control as an aggravating factor. See Trotter v. State, 690 So.2d 1234 (Fla.1996)(Trotter II). In Trotter II, the Court noted that "[c]ustodial restraint has served in aggravation in Florida since the `sentence of imprisonment' circumstance was created," and held that the addition of the community control portion of the statute constituted a refinement of the sentence of imprisonment factor, not a substantive change in the law. Id. at 1237.
An examination of Trotter v. State, 576 So.2d 691 (Fla.1990) (Trotter I) belies the State's contention that probation and community control are essentially the same punishment. In his opinion concurring part and dissenting in part, Justice McDonald noted:
The legislature created community control in chapter 83-131, Laws of Florida, the Correctional Reform Act of 1983. In its findings of fact the legislature stated: "The increased use of noncustodial alternatives and nonprison custodial alternatives can alleviate prison overcrowding while still providing a sufficient measure of public safety and assuring an element of punishment." Id. § 2(4) (emphasis added). Probation is the noncustodial alternative, while community control is the nonprison custodial alternative. § 948.001. A person under community control is in supervised custody; one on probation is not. Community control is a harsher sentence than probation.
. . . .
... In guidelines sentences the first cell allows community control or a specified *25 term of years. "Or" is disjunctive, not conjunctive, and from this one must conclude that community control is the functional equivalent of imprisonment. The difference between the two is where the custody takes place.
The cases cited by the majority which hold that probation is not incarceration are not applicable to one who is sentenced to community control. I am satisfied that one sentenced to community control is under sentence of imprisonment within the definition of subsection 921.141(5)(a).
Id. at 695-96. (McDonald, J., concurring in part, dissenting in part). Moreover, the Trotter I majority specifically held, "[P]robation is not equivalent to being under sentence of imprisonment, for the appellant was not incarcerated." Trotter, 576 So.2d at 694. See also Smith v. State, 651 So.2d 1218 (Fla. 2d DCA 1995)(finding in a pre-Trotter II decision that the trial court improperly entered a habitual offender sentence when the habitual offender statute referred to probation and defendant was on community control).
In light of the distinction between probation and community control, we find that the change is a substantive one and was not intended to be retroactively applied. Given the substantive nature of the subject amendment, application to Zack's sentence was error. See State v. Hootman, 709 So.2d 1357 (Fla.1998), abrogated on other grounds, State v. Matute-Chirinos, 713 So.2d 1006 (Fla.1998).
However, four other aggravating factors support the imposition of the death penalty. Thus, any error in retroactively applying section 921.141(5), Florida Statutes (1997), to Zack was harmless beyond a reasonable doubt. See Peterka, 640 So.2d at 71.

Photographic Evidence
As his final point on appeal, Zack challenges the trial court's denial of his request to introduce a photograph of his niece into evidence during the penalty phase. We find no error on this point. Admission of evidence is within the sound discretion of the trial court. See Cole v. State, 701 So.2d 845 (Fla.1997). Zack was allowed to introduce numerous photographs of his family and to offer testimony from his sister that he had a niece with whom he could form a familial relationship if sentenced to life in prison. A photograph of Zack's niece was unnecessarily cumulative. See Johnson v. State, 660 So.2d at 645. Even assuming the trial court erred in excluding the photograph, given the testimony regarding the niece and the cumulative nature of the photograph, any error in failing to admit it was harmless beyond a reasonable doubt.

Proportionality
Although Zack raises no argument on the issue of proportionality, we address this point pursuant to our constitutional mandate. See Art. I, § 17, Fla. Const.; Tillman v. State, 591 So.2d 167, 169 (Fla. 1991).
The death penalty is reserved for only the most aggravated and the least mitigated of first-degree murders. See Urbin v. State, 714 So.2d 411 (Fla.1998); State v. Dixon, 283 So.2d 1 (Fla.1973). Our proportionality review rests upon recognition that death is a uniquely irrevocable penalty, requiring uniformity in its imposition. See Urbin, 714 So.2d at 416-17; Sinclair v. State, 657 So.2d 1138, 1142 (Fla.1995). Thus, this Court must undertake a qualitative review of the particular circumstances of the instant case in comparison to other capital cases and then decide if death is the appropriate penalty in light of those other decisions. See Tillman, 591 So.2d at 169.
Here, the trial court found four valid aggravating factors: (1) the murder was committed in conjunction with a robbery, sexual battery, or burglary; (2) the murder was committed for financial gain; (3) the murder was especially heinous, *26 atrocious, and cruel; and (4) the murder was committed in a cold, calculated, and premeditated manner. The court also found, but gave little weight to, three statutory mitigators: (1) the murder was committed under an extreme mental or emotional disturbance; (2) the murder was committed under extreme duress; and (3) the defendant lacked the capacity to appreciate the criminality of his conduct. In addition three nonstatutory mitigators were considered: (1) defendant's remorse; (2) defendant's voluntary confession; and (3)the good conduct of the defendant while incarcerated. After full consideration of these factors and the circumstances of this case, we find this case to be in line with other cases in which we have affirmed the death penalty. See, e.g., Brown v. State, 721 So.2d 274 (Fla.1998)(affirming death penalty where evidence established the four valid aggravating factors of prior violent felony conviction, murder committed during robbery and pecuniary gain (merged), heinous, atrocious, and cruel, and cold, calculated, and premeditated, and two nonstatutory mitigating circumstances involving Brown's family background and Brown's drug and alcohol abuse); Gordon v. State, 704 So.2d 107 (Fla.1997)(affirming death penalty where evidence established the four aggravating factors of murder during commission of burglary, pecuniary gain, heinous, atrocious, and cruel, and cold, calculated, and premeditated, and only minimal evidence in mitigation for the drowning murder and robbery of victim); Cole v. State, 701 So.2d at 856 (affirming death penalty where court found the four aggravating factors of heinous, atrocious, and cruel, prior violent felony for contemporaneous conviction, murder committed during kidnaping, and pecuniary gain, and two nonstatutory mitigating factors of mental incapacity and deprived childhood, where defendant and accomplice killed victim by beating him in head and slitting his throat); Rolling v. State, 695 So.2d 278 (Fla.1997)(death sentence proportionate where trial court found the four aggravators of heinous, atrocious, and cruel, prior violent felony, murders during commission of burglary or sexual battery and cold, calculated, and premeditated outweighed two statutory mitigators and significant nonstatutory mitigation); Henyard v. State, 689 So.2d 239 (Fla.1996)(finding four aggravators including heinous, atrocious, and cruel, prior violent felony, and murder during commission of kidnaping and sexual battery outweighed two statutory mitigators and minor nonstatutory mitigation); Marshall v. State, 604 So.2d 799 (Fla.1992)(affirming death sentence where four strong aggravators, including heinous, atrocious, and cruel, prior violent felony, defendant under sentence of imprisonment, and murder during commission of burglary outweighed minor mitigation).
We affirm Zack's convictions for first-degree murder, sexual battery, and robbery. We also affirm the imposition of the death penalty.
It is so ordered.
HARDING, C.J., and SHAW, WELLS, ANSTEAD, PARIENTE, LEWIS and QUINCE, JJ., concur.
NOTES
[1] Chandler also testified that Zack did not drink much, and he never saw Zack intoxicated.
[2] There is no indication in this record that a gun was in the guest bedroom.
[3] McEwing is the sister who allegedly killed their mother. She was declared insane and spent three or four years in a mental hospital. She indicated Midkiff raped her and told her not to tell or he would kill the family.
[4] After undergoing hypnosis, Knight stated that she was hiding under the bed when Midkiff, not Theresa, killed her mother.
[5] The twelve claims presented in this appeal are: (1) the court erred in admitting Williams rule evidence; (2) the court erred in denying a motion for judgment of acquittal on the sexual battery charge; (3) the trial court erred in denying the motion for judgment of acquittal on the robbery charge; (4) the trial court erred in instructing the jury on felony murder based upon a burglary; (5) the sentencing order failed to consider all of the mitigating evidence presented; (6) the trial court erred in finding that the murder was committed to avoid or prevent a lawful arrest; (7) the trial court erred in finding that the murder was committed in a cold, calculated and premeditated manner; (8) the trial court erred in using victim impact evidence; (9) the trial court erred in admitting the rebuttal evidence from Candice Fletcher; (10) the trial court erred by failing to give Zack's proposed instruction on the role of sympathy; (11) the trial court erred in retroactively applying the aggravating factor of a murder committed while on felony probation; and (12) the trial court erred in refusing to admit a family photo during the penalty phase.
[6] While evidence was introduced that Zack stole Edith Pope's vehicle, the defense is not challenging its admissibility; this issue is solely limited to the Rosillo and Chandler evidence.
[7] In Miller we held that "if a defendant can establish that the premises were open to the public, then this is a complete defense." Id. at 957.
[8] Zack argues that the trial court failed to fully consider voluminous evidence that he was incapacitated by virtue of his suffering from FAS and PTSD. A review of the sentencing order demonstrates the court reviewed the evidence and then explained at length why it did not find the psychological mitigating evidence to be particularly compelling. This evaluation of the witnesses' testimony in assigning the appropriate weight to a mitigating factor was proper. See Hildwin v. State, 727 So.2d 193, 197 (Fla.1998)(finding that trial court properly rejected expert psychological testimony in light of the fact that the experts failed to talk to recent witnesses to defendant's behavior and the experts' characterization of defendant's behavior was at odds with the testimony of recent eyewitnesses) cert. denied, ___ U.S. ___, 120 S.Ct. 139, 145 L.Ed.2d 119 (1999). Further, the trial court was entitled to reject Zack's evidence in this respect where it was contradicted by numerous witnesses, from different counties, who had seen Zack at different times and who were in a position to observe Zack closely in the hours before and after the Smith crimes. See Wuornos v. State, 644 So.2d at 1008; Walls v. State, 641 So.2d 381 (Fla.1994).
[9] Zack challenges the applicability of the felony probation aggravating factor to this case; that issue will be discussed separately.
[10] In the penalty phase closing argument the State referred to sympathy on two occasions. First, in discussing aggravators and the role they play in the deliberative process, the State argued, "Bare [sic] in mind that sympathy and bias and prejudice have no place in that jury room. They have to be left out in the hallway. We are talking about common sense, a reasoned evaluation and judgment of the facts, the application of those facts to the law." (Tr. vol. XI at 2061-62).

Later, in discussing victim impact evidence, the State argued, "The defense's experts told you they talked to family members. I'll be the first one to tell you there's two tragedies here. There is the victim's family and, of course, you heard some of them testify. It was heart wrenching, there is no questions about that. Put sympathy aside. I don't want sympathy in that jury room on my evidence, and don't let it in the jury room on what the Defense presented you." (Tr. vol. XI at 2077).