975 So.2d 519 (2008)
The STATE of Florida, Petitioner,
v.
Richard RAMBARAN and Danny Pierre-Louis, Respondents.
No. 3D06-2400.
District Court of Appeal of Florida, Third District.
January 23, 2008.
*520 Bill McCollum, Attorney General; Katherine Fernandez Rundle, State Attorney, and Christine E. Zahralban, Assistant State Attorney, for petitioner.
Charles G. White, Miami, for respondent Rambaran; Sidney P. Smith, for respondent Pierre-Louis.
Before SUAREZ and ROTHENBERG, JJ., and FLETCHER, Senior Judge.

On Motion for Rehearing
ROTHENBERG, Judge.
We grant Richard Rambaran's ("Rambaran") and Danny Pierre-Louis' ("Pierre-Louis") (collectively "the defendants") motion for rehearing, withdraw our former opinion dated October 31, 2007, and substitute the following opinion in its stead.
The State seeks certiorari review of two orders issued by the trial court granting motions filed by the defendants, to sever counts 4 and 5 of the indictment, and to exclude the evidence pertaining to those counts, which the State sought to introduce either as charged crimes or as collateral crimes evidence. Because we conclude that the trial court departed from the essential requirements of the law in excluding this evidence as collateral crimes evidence, and that the exclusion of this evidence will result in irreparable harm, we grant the State's petition and quash the trial court's order denying the State's motion to introduce the evidence pertaining to counts 4 and 5 of the indictment as collateral crimes evidence.

THE EVIDENCE
Leeah Thurston ("Leeah"), who was approximately sixteen years of age, became romantically involved with her neighbor, Rambaran, and gave birth to their son in 1999.

May 15, 2001, Collateral Crimes Evidence
Two years after the birth of their child, Leeah decided to terminate her relationship with Rambaran, and on May 15, 2001, she agreed to meet with him at the hotel room where he was living at the time to discuss his visitation with their son. After briefly discussing their son, Rambaran told Leeah that he wanted to resume their relationship, and when she refused, Rambaran trapped her in the room, choked her, threatened her with a knife, threatened to kill her and himself, and shoved a towel into her mouth when she attempted to scream. After Rambaran released Leeah, she called the police, and Rambaran was arrested. He posted bond and was released, and the trial court issued a stay-away order.

Mid-October, 2001, Collateral Crimes Evidence
Despite the stay-away order, Leeah and Rambaran unsuccessfully attempted a reconciliation. In mid-October, 2001, Rambaran told Leeah that he would not allow her to leave him. They argued, and Rambaran shoved Leeah across the room into a bureau. When he realized what he had done, Rambaran apologized and allowed Leeah to leave. After this incident, Leeah refused to see Rambaran again.

November 3, 2001-Count 6 of the Indictment (burglary with an assault and/or a battery on Leeah)
On November 2, 2001, Leeah, who was a nursing student and who had worked the evening shift at Mt. Sinai Medical Center, returned home and began studying. Rambaran called Leeah and asked to see her. Leeah told him she was going to go out to get something to eat and that she would not be home. When Leeah returned at approximately 3:55 a.m. the next morning and opened her car door, Rambaran stepped in front of her door, blocking her *521 exit and demanded that she tell him where she had been. When Leeah tried to exit her car, Rambaran pushed her back inside, grabbed her head between his hands, and tried to snap her head sideways. When Leeah tried to reach the car horn, Rambaran pushed her down onto the passenger seat, punched her in the eye, pulled out a kitchen knife, and held it to her neck while screaming that she was cheating on him.
At first, Leeah tried to calm Rambaran down. When she was unable to do so, she tried to hit him with a bottle, but she missed. With the knife pointed to her neck, Leeah asked Rambaran why he was doing this to her. Rambaran responded that he wanted Leeah to go home with him. Leeah, whose eyelid was torn, and whose mouth and face were swollen and bleeding, agreed to go with him, but she requested that he let her go inside her house to clean up first. Once inside, Leeah ran to her mother's room and called 911. Rambaran stood outside her home demanding that she open her window. Leeah refused, and Rambaran left before the police arrived. Leeah was treated for her injuries, received five sutures to her eyelid, and a BOLO was issued for Rambaran's arrest.

November 26, 2001-Counts 4 and 5 (attempted murder of Shay Williams and Kim Lowery)
Rambaran remained at large for three weeks. During this time, Leeah saw him parked across the street from her house two or three times, and he approached her twice as she was leaving the house with other people. Although Leeah alerted the police several times, Rambaran eluded the police.
At approximately 9:00 p.m. on November 26, 2001, Shay Williams and Kim Lowery were in Leeah's car in the drive-through lane of a fast food restaurant when Pierre-Louis, who was driving a red Mitsubishi Eclipse rental car, blocked the car Shay Williams and Kim Lowery were in. Rambaran, who was in the car with Pierre-Louis, exited the rental car, approached Shay Williams, and demanded that Shay Williams "give it up," claiming that the car belonged to him. When Shay Williams refused, Rambaran threatened to kill him. Both Shay Williams and Kim Lowery saw a gun on the front seat of the rental car Rambaran and Pierre-Louis arrived in. Kim Lowery called for help, and when Rambaran and Pierre-Louis saw the police drive past the group, they got back into their rental car and drove off. As Shay Williams and Kim Lowery drove north on N.W. 27th Avenue, Pierre-Louis pulled alongside Williams and Lowery, Rambaran held up a firearm, and he told Shay Williams to get out of the car. In fear for his life, Shay Williams braked fast into a u-turn and sped off towards a police substation with Pierre-Louis in hot pursuit and Rambaran firing at them. One projectile penetrated the vehicle and passed over Kim Lowery's head, who had crawled into the back seat during the chase. When Shay Williams pulled into the police substation, Pierre-Louis and Rambaran terminated the chase and disappeared. Within two hours of this incident, Rambaran and Pierre-Louis exchanged the red Eclipse for a white Toyota at a car rental agency.
November 27, 2001-Counts 1, 2, and 3 (murder of Latoya Johnson, attempted murder of Leeah, and burglary with an assault and/or a battery)
Shay Williams called Leeah at work and told her what had happened. Leeah, who already had sent her baby out of town, was afraid that Rambaran would see her and Williams together and, therefore, asked a friend to pick her up from work. When Leeah approached her house, she spotted *522 a white car parked nearby. Because Leeah believed Rambaran was in the car, she became frightened and asked her friend to drive past the house and to continue driving around for a couple of hours. At approximately midnight, Leeah called her house and spoke to her cousin Latoya and asked her to check to see whether Rambaran was in the vicinity. Although Latoya could not assure Leeah that Rambaran was not in the vicinity, Leeah decided to return home. Shortly after her arrival, Rambaran called Leeah and asked her if her boyfriend had told her that Rambaran had shot at him earlier. When Leeah denied that Williams was her boyfriend, Rambaran told Leeah he would "catch them" and "bury them both." He told Leeah that he was going to kill her and her whole family and put "all of y'all in body bags."
At approximately 2:00 a.m., Rambaran called Leeah again and asked her where she was staying in the house. Leeah refused to tell him and hung up the phone. At approximately 4:00 a.m., Leeah heard Latoya screaming. Latoya was in the room next to where Leeah was sleeping. When Leeah went to Latoya's room, she found Rambaran straddling Latoya in her bed pressing a pillow against her head as she struggled.
Leeah ran back to her room, locked the door, and called 911. The operator kept Leeah on the line until the police arrived. Leeah heard someone pick up the phone, listen, and then drop the phone.
Latoya sustained six major stab wounds to her head, upper body, neck, and throat, with one wound penetrating through the back of her neck and into her arm. By the time the police arrived, Latoya was unresponsive and Rambaran was gone. Latoya died shortly thereafter from her wounds.
Rambaran fled the scene with Pierre-Louis, who was waiting near Leeah's house in the white Toyota rental car, which they later exchanged for a Mitsubishi Lancer at the rental agency. Rambaran and Pierre-Louis were subsequently arrested and Rambaran's blood was found on the passenger side of the white Toyota used during the homicide, attempted murder, and burglary with an assault and/or a battery on November 27.

CERTIORARI REVIEW IS APPROPRIATE IN THIS CASE
On November 26, 2001, the defendants moved to sever counts 4 and 5, which are the attempted murders of Shay Williams and Kim Lowery. In response, the State objected to the severance of these charges, and the State moved to introduce the evidence of the attempted murders as collateral crimes evidence if the trial court granted the defendants' motion to sever counts 4 and 5. The State argued that the events that occurred on the evening of November 26 were inextricably intertwined with the burglary and attack upon Leeah with a kitchen knife on November 3. The State also argued that the events that occurred on November 26 were inextricably intertwined with the murder of Latoya, attempted murder of Leeah, and burglary that occurred during the early hours of November 27, only a few hours later. The trial court granted the defendants' motion to sever counts 4 and 5 and denied the State's motion to admit the evidence as collateral crimes evidence.
Although a trial court's order granting severance is generally not reviewable by certiorari because severance of charges for trial rarely results in irreparable harm, pretrial orders excluding relevant material evidence are subject to certiorari review. See Richardson v. State, 706 So.2d 1349, 1357 (Fla.1998) (stating *523 that important to the fair administration of criminal justice in this state is the ability of the State to petition the district courts of appeal for certiorari review of pretrial orders rendered in criminal cases); State v. Cruz, 851 So.2d 249, 251 (Fla. 3d DCA 2003) (granting State's petition for writ of certiorari where the trial court excluded the testimony of a confidential informant as a sanction for prosecutorial misconduct or lack of due diligence, finding that "certiorari review of a non-final pretrial order is appropriate in a case such as this in which, if the defendant is acquitted, the State has no right to a direct appeal"); State v. Charles, 827 So.2d 1107, 1109-10 (Fla. 3d DCA 2002) (granting petition for certiorari where the trial court precluded the State from introducing perpetuated testimony of the alleged victim); State v. Frazier, 753 So.2d 644, 646 (Fla. 5th DCA 2000) (granting State's petition for writ of certiorari where the trial court excluded the victim's 911 call).
While the State must demonstrate that the trial court's order is a departure from the essential requirements of the law resulting in a miscarriage of justice to be entitled to certiorari review, see Combs v. State, 436 So.2d 93, 96 (Fla. 1983), this Court held in State v. Steinbrecher, 409 So.2d 510, 511 (Fla. 3d DCA 1982), that "a pretrial order excluding evidence which has the effect of substantially impairing the ability of the state to prosecute its case is subject to certiorari review." The Florida Supreme Court in State v. Pettis, 520 So.2d 250, 253 (Fla.1988), likewise held that:
The ability of the district courts of appeal to entertain state petitions for certiorari to review pretrial orders in criminal cases is important to the fair administration of criminal justice in this state. Otherwise, there will be some circumstances in which the state is totally deprived of the right of appellate review of orders which effectively negate its ability to prosecute. If a nonfinal order does not involve one of the subjects enumerated in Florida Rule of Appellate Procedure 9.140(c)(1), the state would not be able to correct an erroneous and highly prejudicial ruling. Under such circumstances, the state could only proceed to trial with its ability to present the case significantly impaired. Should the defendant be acquitted, the principles of double jeopardy prevent the state from seeking review; thus, the prejudice resulting from the earlier order would be irreparable.FN2 The filing of a petition for certiorari is an apt remedy under these circumstances.
FN2 The defendant does not suffer the same prejudice because he always has the right of appeal from a conviction in which he can attack any erroneous interlocutory orders.
(Emphasis added).
We conclude that the trial court's exclusion of relevant material evidence, that is inextricably intertwined with the remaining charged offense, is a departure from the essential requirements of the law which will result in irreparable harm. We, therefore, grant the State's petition for writ of certiorari.

LEGAL ANALYSIS
The events that occurred on the evening of November 26, 2001, are charged in counts 4 and 5 of the indictment, which include the attempted first-degree premeditated murders of Shay Williams and Kim Lowery. The evidence the trial court excluded by severing these two counts for trial and by denying the State's motion to introduce the evidence as collateral crimes evidence is as follows.
*524 While there was an open arrest warrant for Rambaran for an armed assault and battery upon Leeah, wherein he is charged with punching Leeah in the eye, holding a kitchen knife to her neck, and beating her, Rambaran was seen casing out Leeah's house. Rambaran and Pierre-Louis confronted Shay Williams, who Rambaran believed was Leeah's new boyfriend, and Rambaran threatened to kill Shay Williams. When Shay Williams fled, Rambaran fired shots into the car, narrowly missing Kim Lowery. When Shay Williams told Leeah what occurred, Leeah was afraid to be seen with Shay Williams or to go home. Therefore, Leeah had a friend pick her up at work, and when she saw Rambaran near her house, she had her friend drive her around for a couple of hours. When Leeah did not return to her home, Rambaran called her and asked her if her "boyfriend" told her what had happened. When Leeah denied that Williams was her boyfriend, Rambaran threatened to "bury them both" and to kill her and her family and put them all in body bags.
To exclude this evidence was error. The excluded evidence is relevant, material, and inextricably intertwined with the events that allegedly occurred only a few hours later. The excluded evidence establishes the entire context out of which the murder of Latoya, the attempted murder of Leeah, and the armed burglary with an assault arose, as charged in counts 1, 2, and 3 of the indictment, and it is necessary to adequately describe the events leading up to the commission of those offenses. The excluded evidence is not only important to establish a continuing claim of chronological events, but also is highly relevant and probative of the perpetrators' intent, motive, identity, and the absence of mistake.
"The primary test for admissibility of collateral crimes evidence is relevancy." Irizarry v. State, 905 So.2d 160, 164 (Fla. 3d DCA 2005); see also Williams v. State, 621 So.2d 413, 414 (Fla.1993) (holding that other crimes, whether factually similar or dissimilar to the charged crime, are admissible if the evidence is relevant to prove a matter of consequence other than bad character or propensity). "[T]o prove its case, the State is entitled to present evidence which paints an accurate picture of the events surrounding the crimes charged." Griffin v. State, 639 So.2d 966, 970 (Fla.1994) (citing Smith v. State, 365 So.2d 704, 707 (Fla.1978)).
Additionally, evidence is inextricably intertwined if it is necessary to: (1) establish the entire context out of which the charged crimes arose, Foster v. State, 679 So.2d 747, 753 (Fla.1996); Hunter v. State, 660 So.2d 244, 251 (Fla.1995); Griffin, 639 So.2d at 970; Dorsett v. State, 944 So.2d 1207, 1213 (Fla. 3d DCA 2006); Vail v. State, 890 So.2d 373, 376 (Fla. 3d DCA 2004); (2) provide an intelligent account of the crimes charged, Vail, 890 So.2d at 376; Burgos v. State, 865 So.2d 622, 624 (Fla. 3d DCA 2004); Austin v. State, 500 So.2d 262, 265 (Fla. 1st DCA 1986); or (3) adequately describe the events leading up to the crimes. Griffin, 639 So.2d at 969-70; Geske v. State, 770 So.2d 252, 253 (Fla. 5th DCA 2000).
The excluded evidence in the instant case is relevant, material, and inextricably intertwined, as it is necessary to explain why Rambaran was so enraged, why he broke into Leeah's house, why he murdered Latoya when his rage was directed at Leeah, and to establish that he also intended to kill Leeah that night. To exclude the attempted murders of Shay Williams, who Rambaran believed was Leeah's boyfriend, and Kim Lowery, who just happened to be with Shay Williams when Rambaran began shooting at the car they were in, and Rambaran's conversations *525 with Leeah hours before, would make it impossible to explain Rambaran's rage or to establish that the murder of Latoya was premeditated, and that Rambaran also intended to kill Leeah. Without the collateral crimes evidence, the evidence would suggest that either Rambaran intended to harm Leeah and mistakenly killed Latoya, or that some unknown person unrelated to Leeah attacked and killed Latoya. The entire context out of which these crimes arose, and the events that occurred on November 26, provide an intelligent account of the events that led to the crimes being tried, and provide evidence of the perpetrators' intent, motive, identity and the absence of mistake.
Additionally, Pierre-Louis' involvement with the events that occurred on November 26, are important to link him as a principal to the burglary, murder, and the attempted murder on November 27, at Leeah's house. Just hours before the events that took place at Leeah's house, Pierre-Louis, who was driving a rental car with Rambaran as a passenger, blocked the car Shay Williams was in. Pierre-Louis and Rambaran pursued Williams as he fled for his life with Rambaran shooting at the car because Rambaran believed Williams was involved with Leeah. If this relevant evidence is excluded, it would substantially limit the State's ability to demonstrate Pierre-Louis' involvement in the offenses on November 27. Pierre-Louis actively participated in the events that occurred on November 26, by blocking the car Shay Williams was in and driving the car in pursuit of Shay Williams while Rambaran shot at Williams and Lowery. Pierre-Louis' actions, when viewed with Rambaran's threats to kill Leeah and her entire family, Pierre-Louis' attempt to hide the evidence by exchanging the rental car he was driving after they pursued and shot at Shay Williams, and their subsequent exchange of rental cars after the murder of Latoya and attempted murder of Leeah, are relevant to show Pierre-Louis' knowledge of the crimes and participation as the "get-away" driver on November 27. Without the evidence, which was excluded by the trial court, the jury could conclude that Pierre-Louis innocently drove Rambaran to Leeah's house and did nothing to facilitate the crimes committed therein. The collateral crimes evidence is inextricably intertwined as it demonstrates Pierre-Louis' involvement in the crimes charged and his concealment and destruction of the evidence.
In Zack v. State, 753 So.2d 9, 17 (Fla. 2000), the Florida Supreme Court concluded that evidence of a three-week series of events preceding the charged crime was admissible, noting that "the circumstances of the charged offenses were not happenstance but a series of calculated actions on the part of the defendant." The collateral crimes evidence was admissible because it "casts light on Zack's motive, intent, and the timing of the . . . assault." Id. Similarly, the events that occurred on November 27, were a continuation of, and a consequence of, Rambaran's possessiveness of Leeah, his belief that she was involved with Shay Williams, his anger towards both Shay Williams and Leeah, and his intent to kill Leeah and the people close to her.
The defendants argue, and the trial court found, that because the events on November 26 and November 27 involve different victims, the evidence surrounding the events on the 26th is inadmissible. We disagree. Even events involving different victims may be admissible as collateral crimes evidence if the evidence is relevant to a material issue at trial and is being offered for a reason other than to show propensity or bad character.
*526 In Jones v. State, 931 So.2d 243 (Fla. 5th DCA 2006), the trial court admitted evidence of a robbery and aggravated assault of a totally different victim than the victim of a murder and robbery that took place shortly thereafter. Although the two incidents occurred at different times and different locations, and involved different victims, the Fifth District Court of Appeal concluded that the collateral crimes evidence was properly admitted as inextricably intertwined evidence of a continuing criminal episode. Id. at 243-44; see also State v. Shaw, 730 So.2d 312, 313 (Fla. 4th DCA 1999) (granting State's petition for writ of certiorari where trial court denied State's motion to introduce evidence of an attempted robbery of a restaurant one-half hour prior to the robbery and murder of a taxi driver, finding that the earlier robbery was admissible to show the defendant's motive and intent that he needed money because the restaurant robbery had failed); State v. Cohens, 701 So.2d 362, 364 (Fla. 2d DCA 1997) (granting State's petition for writ of certiorari where trial court denied State's motion to admit collateral crimes evidence, finding that the attempted robbery of a bakery half an hour prior to the shooting death of a clerk at a gas station was admissible as inextricably intertwined evidence because it established Cohens' motive for being present at the gas station and rebutted Cohens' statement that he was merely present outside of the store); Austin v. State, 500 So.2d 262, 265 (Fla. 1st DCA 1986) (holding that the testimony that the defendant attempted to shoot and rob someone in the restroom of a service station was admissible in the trial of a subsequent robbery and attempted murder to cast light on the character of the crimes charged, to establish motive, and to provide an intelligent account of the criminal episode).
We conclude that the collateral crimes evidence excluded by the trial court is highly relevant as to Rambaran and Pierre-Louis' intent, motive, and premeditation. Additionally, the evidence is inextricably intertwined, as it is necessary to establish the entire context out of which the charged crimes arose to adequately describe the events leading up to the crimes, and to explain why Latoya was killed. Thus, the trial court erred in excluding the evidence.

SEVERANCE
The State also seeks certiorari review of the trial court's order granting the defendants' motion to sever counts 4 and 5 of the indictment. While we decline to address the severance issue on certiorari review, the trial court is free to reconsider its earlier ruling severing counts 4 and 5 from the trial of counts 1, 2, 3, and 6 in light of this Court's ruling regarding the admissibility of the facts and circumstances that form the basis of counts 4 and 5, as collateral crimes evidence.
Petition granted; order denying State's motion to admit collateral crimes evidence quashed.