888 So.2d 163 (2004)
Timothy C. CONLEY, Appellant,
v.
STATE of Florida, Appellee.
No. 5D02-3433.
District Court of Appeal of Florida, Fifth District.
December 3, 2004.
*164 James B. Gibson, Public Defender, Barbara C. Davis, Assistant Public Defender, Daytona Beach, for Appellant.
Charles J. Crist, Jr., Attorney General, Tallahassee, and Belle B. Schumann, Assistant Attorney General, Daytona Beach, for Appellee.
THOMPSON, J.
Timothy C. Conley appeals his convictions for kidnapping, four counts of sexual battery, and unlawful sexual activity with a minor.
Conley contends that the court erred in allowing the introduction of evidence under section 90.404(2)(a), Florida Statutes, which provides:
Similar fact evidence of other crimes, wrongs, or acts is admissible when relevant to prove a material fact in issue, including, but not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, but it is inadmissible when the evidence is relevant solely to prove bad character or propensity.
The victim, 17 years old and five feet three inches tall on 3 August 2000, testified that at about 10:15 a.m. or 10:30 a.m., she was walking to the restaurant where she worked when Conley approached her in a car and asked her if she wanted a ride. She declined, and he drove away, but he came back about ten minutes later, offering her a ride. When she again declined, he reached under his seat, said he had a gun, and told her to get in. She did as she was told. The victim testified that Conley pushed her head down and drove around. He turned onto what she could sense was a dirt road and pulled into a garage. She took off her shirt and bra as ordered, and Conley began fondling her breasts. He directed her out of the car and into the living room of the attached house. She had her shirt and bra in her hand along with a bag containing her work uniform. They went to the couch where she performed oral sex on him as ordered, and he called her a "slut." He penetrated her while they were on the couch and did the same after he ordered her to the floor. Conley told the victim to get dressed and asked her name. She told him her name, but he did not believe her, so she showed him her restaurant name tag. He asked for her pager number and said he would hurt her if she gave the wrong number. She wrote down the number, which he checked by dialing it on a telephone. As ordered, she also wrote down her home and work numbers. At some point, he asked her how old she was, and she told him she was seventeen.
The victim testified that Conley told her he was going to take her to work. She testified that they went out to the car, and because she thought there was a gun in it, she asked to be taken to work in a maroon car that was also in the garage. Conley said there were no tags on that car so they got into the car in which they had arrived. He put her head down as they drove away. *165 "He drove down a bunch of different roads" and dropped her off at the restaurant where she worked. Conley told her that he wanted to be her boyfriend. He asked what time she got off work, and said he wanted to pick her up and take her out to dinner. After being dropped off at the restaurant, the victim ran in and reported what had happened to a superior, who testified that she had been crying and distraught. The victim testified that she obeyed Conley because she feared he would kill her.
The first collateral crime witness testified that on 15 June 1993, she was eighteen years old and five feet tall. She had been smoking a cigarette outside the automotive section of a mall, where she had taken her boyfriend's car. Conley came up behind her in a truck, grabbed her, and "stuffed" her into the truck. He eventually drove down a dirt road. He had a hammer and threatened to kill her. After forcing her to perform oral sex on him, he penetrated her. He asked how old she was, and she lied and said she was sixteen. He stopped, said he was sorry, and said he would take her back to the mall. When they returned to the mall, he asked for her telephone number. He told her they should be "boyfriend and girlfriend" and that he wanted to take her to dinner. She went inside and called the police.
The other collateral crime witness was five feet four inches tall, and was sixteen years old on May 14, 1993. She was walking along the highway when Conley approached her in a cable communications work truck. Conley, wearing work clothes, asked if she wanted a ride. When she declined, he remarked that it was very hot outside and asked where she was going. She told him where she was headed, and he replied that he had a job that way and would drop her off. She got in, but he drove past the intersection near where she lived. He told her he had a quick job to do, after which he would drop her off. He drove to some large power line poles and got out and looked at one of the poles. He came back saying he needed something behind her. She tried to jump out of the truck, but he grabbed her arms and lifted her back in. He pulled down her pants, but failed to penetrate her because he did not have an erection. He asked how old she was, and she said she was sixteen. She was focusing on his face so she could remember what he looked like, and he responded by putting a hammer to her head and telling her that he would kill her if she did not stop looking at him. After masturbating and ejaculating, he said he was sorry. She said she would walk home, but he said he would drive her. When a police car drove past them on the road, she tried to get out. Conley held her down until the police car was out of sight and then let her leave.
Conley testified that he had been house-sitting for two weeks and was driving the homeowner's car when he saw the victim and offered her a ride. He claimed that she voluntarily went to the house and had sex with him. According to Conley, he offered to accommodate her after she said she had not had sex for a year. She wrote her beeper and telephone numbers on a piece of paper, which he later gave to the deputies. Conley testified that she had asked for ten dollars for her services, but that he declined to pay. He denied asking her to have dinner with him.
Conley did not dispute that he committed the collateral crimes; he admitted them at the time he was charged. The trial court ruled that the collateral crime evidence was not too remote in time to be admissible because Conley was released from prison in December 1999, and the instant offense was alleged to have occurred in August 2000.
*166 We have no difficulty in holding that the collateral crime evidence was admissible. Conley claimed that the sexual acts were consensual, and his possession of the victim's pager and telephone numbers tended to corroborate that claim. On the other hand, the similar methods of operation in the collateral crimes and in the instant case tend to rebut that contention. Section 90.404(2)(a), which is a codification of the rule announced in Williams v. State, 110 So.2d 654 (Fla.1959), provides that collateral crime evidence is admissible to prove a material fact in issue. Here, the material fact in issue was whether the acts were consensual. Compare Williams v. State, 621 So.2d 413 (Fla.1993) (evidence of prior sexual assault was admissible to rebut defense contention that complainant consented to sex in exchange for drugs). Because the collateral crime evidence in this case was relevant to an issue other than bad character or propensity, it was admissible. See Williams, 110 So.2d at 662 (collateral crime evidence, "[i]f found to be relevant for any purpose save that of showing bad character or propensity," should be admitted).
We agree with Conley that collateral crime evidence should not become a feature of the trial. See Zack v. State, 753 So.2d 9 (Fla.2000). Evidence should not be admitted, even if relevant, if its probative value is outweighed by its unfair prejudice. § 90.403, Fla. Stat. Here, the collateral crime evidence was definitely prejudicial, but we cannot conclude that it was unfairly prejudicial. As stated earlier, Conley's claim of consent was buttressed by his possession of the victim's telephone and pager numbers, but the collateral crime evidence tended to rebut that claim. Conley complains that during closing argument, the prosecutor compared the circumstances of the collateral crimes with the circumstances of the charged crimes, but such a comparison was the purpose for which the collateral crime evidence was entered. Furthermore, the testimony by the collateral crime witnesses was straightforward and brief so that it did not divert attention from the crime at issue. Accordingly, the convictions are affirmed.
AFFIRMED.
ORFINGER, J., concurs.
PETERSON, J., concurs in result only.