# Supreme Court of Florida

_____

No. SC2023-1233

_____

**MICHAEL DUANE ZACK, III,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

September 21, 2023

FRANCIS, J.

Michael Duane Zack, III, murdered two women in 1996 over the course of a nine-day crime spree. On August 17, 2023, Governor Ron DeSantis signed Zack's death warrant for the murder of Ravonne Smith, scheduling Zack's execution for October 3, 2023. Zack sought relief, filing his fourth successive postconviction motion in the circuit court raising two claims: (1) that his execution should be barred under the Eighth Amendment because his Fetal Alcohol Syndrome (FAS) is the functional equivalent of an intellectual disability; and (2) that his execution should be barred

under the Eighth Amendment because the jury's penalty phase recommendation to impose the death penalty was not unanimous (eleven-to-one). The postconviction court summarily denied Zack's claims as untimely, procedurally barred, and meritless. We agree and affirm.[1] We also deny Zack's motion for stay of execution and request for oral argument filed in this Court.

## I. Facts

We described the facts of the case on direct appeal as follows:

Although the murder of Smith took place on June 13, 1996, the chain of events which culminated in this murder began on June 4, 1996, when Edith Pope (Pope), a bartender in Tallahassee, lent her car to Zack. In the weeks prior, Zack had come to Pope's bar on a regular basis. He generally nursed one or two beers and talked with Pope; she never saw him intoxicated. He told her that he had witnessed his sister murder his mother with an axe. As a result, Pope felt sorry for Zack, and she began to give him odd jobs around the bar. When Zack's girlfriend called the bar on June 4 to advise him that he was being evicted from her apartment, Pope lent Zack her red Honda automobile to pick up his belongings. Zack never returned.

From Tallahassee, Zack drove to Panama City where he met Bobby Chandler (Chandler) at a local pub. Over the next several days, Zack frequented the pub daily and befriended Chandler. Chandler, who owned a construction subcontracting business, hired Zack to work in his construction business. When Chandler

---

1. We have jurisdiction. *See* art. V, § 3(b)(1), Fla. Const.

- 2 -

discovered that Zack was living out of a car (the red Honda), he invited Zack to live with him temporarily. On the second night at Chandler's, Zack woke up screaming following a nightmare. Chandler heard Zack groan words which sounded like "stop" or "don't." Although Chandler questioned him, Zack would not discuss the nightmare. Two nights later, on June 11, 1996, Zack left Chandler's during the night, stealing a rifle, a handgun, and forty-two dollars from Chandler's wallet. Zack drove to Niceville, and on the morning of June 12, 1996, pawned the guns for $225.

From Niceville, Zack traveled to Okaloosa County and stopped at yet another bar. At this bar, Zack was sitting alone drinking a beer when he was approached by Laura Rosillo (Rosillo). The two left the bar in the red Honda and drove to the beach, reportedly to use drugs Zack said he possessed. Once on the beach, Zack attacked Rosillo and beat her while they were still in the Honda. He then pulled Rosillo from the car and beat her head against one of the tires. Rosillo's tube top was torn and hanging off her hips. Her spandex pants were pulled down around her right ankle. The evidence suggests she was sexually assaulted; however, the sperm found in Rosillo's body could not be matched to Zack. He then strangled her, dragged her body behind a sand dune, kicked dirt over her face, and departed.

Zack's next stop on this crime-riddled journey was Dirty Joe's bar located near the beach in Pensacola. He arrived there on the afternoon of June 13, 1996, and met the decedent, Ravonne Smith. Throughout the afternoon, Smith, a bar employee, and Zack sat together in the bar talking and playing pool or darts. The bar was not very busy, so Smith spent most of her time with Zack. Both bar employees and patrons testified that Zack did not ingest any significant amount of alcohol and that he did not appear to be intoxicated. In the late afternoon, Smith contacted her friend Russell Williams (Williams) and invited him to the bar because she was lonely. Williams arrived at the bar around 5:30 p.m.

Prior to leaving the bar around 7 p.m., Smith called her live-in boyfriend, Danny Schaffer, and told him she was working late. Smith, Williams, and Zack then left the bar and drove to the beach where they shared a marijuana cigarette supplied by Zack. Afterwards, they returned to the bar and Williams departed. Zack and Smith left the bar together sometime around 8 p.m. and eventually arrived at the house Smith shared with her boyfriend.

Forensic evidence indicates that immediately upon entering the house Zack hit Smith with a beer bottle causing shards of glass and blood to spray onto the living room love seat and two drops of blood to spray onto the interior doorframe. Zack pursued Smith down the hall to the master bedroom leaving a trail of blood. Once in the bedroom Zack sexually assaulted Smith as she lay bleeding on the bed. Following the attack Smith managed to escape to the empty guest bedroom across the hall. Zack pursued her and beat her head against the bedroom's wooden floor. Once he incapacitated Smith, Zack went to the kitchen where he got an oyster knife. He returned to the guest bedroom where Smith lay and stabbed her in the chest four times with the knife. The four wounds were close together in the center of Smith's chest. Zack went back to the kitchen, cleaned the knife, put it away, and washed the blood from his hands. He then went back to the master bedroom, placed Smith's bloody shirt and shorts in her dresser drawer, stole a television, a VCR, and Smith's purse, and placed the stolen items in Smith's car.

During the night, Zack drove Smith's car to the area where the red Honda was parked. He removed the license plate and several personal items from the Honda then moved it to a nearby lot. Zack returned to Panama City in Smith's car and attempted to pawn the television and VCR. Suspecting the merchandise was stolen, the shop owners asked for identification and told Zack they had to check on the merchandise. Zack fled the store and abandoned Smith's car behind a local restaurant.

Zack was apprehended after he had spent several days hiding in an empty house.

After he was arrested, Zack confessed to the Smith murder and to the Pope and Chandler thefts. Zack claimed he and Smith had consensual sex and that she thereafter made a comment regarding his mother's murder. The comment enraged him, and he attacked her. Zack contended the fight began in the hallway, not immediately upon entering the house. He said he grabbed a knife in self-defense, believing Smith left the master bedroom to get a gun from the guest bedroom.

*Zack v. State* (*Zack I*), 753 So. 2d 9, 13–14 (Fla. 2000) (footnotes omitted).

During the guilt phase, Zack's defense was that due to suffering from FAS as well as posttraumatic stress disorder (PTSD), he was "impulsive, under constant mental and emotional distress, and could not form the requisite intent to commit premeditated murder." *Id.* at 14. The State's theory, on the other hand, was that "Zack was a calculated stalker/predator, who stalked his prey in bars." *Id.* "His method of operation included befriending his prey, gaining each person's sympathy with stories of his mother's death and his abusive childhood, then taking advantage of the persons by either robbing or sexually assaulting them." *Id.* The jury found Zack guilty on all counts on September 15, 1997.

During Zack's penalty phase, to establish statutory mitigators, Zack presented four expert witnesses who discussed Zack's mental and emotional health including his FAS. Dr. William Spence, a forensic psychologist, had previously diagnosed Zack with PTSD when evaluating Zack in connection with an earlier offense. The other three experts, Dr. James Larson, Dr. Barry Crown, and Dr. Michael Maher, evaluated Zack *after* the murders of Ms. Smith and Ms. Rosillo, and each diagnosed Zack with both PTSD and FAS. Though none of the experts spoke to anyone who had contact with Zack around the time of the murders, they "opined that the murder was committed while Zack was under an extreme mental or emotional disturbance and that Zack's ability to appreciate the criminality of his conduct was substantially impaired." *Id.* at 15.

One of Zack's experts also presented evidence of his IQ. Dr. Larson testified that Zack had a full-scale IQ of 92. According to Dr. Larson, Zack's performance score was 104 and his verbal score was 84. He opined that the twenty-point difference is statistically significant and makes it highly probable that Zack has organic brain damage.

In rebuttal, the State's expert, neuropsychologist Dr. Eric Mings, testified that Zack's full-scale IQ score was 86—in the low average range. He testified that "[h]e could not diagnose Zack with fetal alcohol syndrome because there were too many variables." *Id.*

The State's other expert, forensic psychologist Dr. Harry McClaren, "indicated he administered the MMPI to Zack, but the malingering scale was outside of the normal limits, making the test useless." *Id.* "Dr. McClaren opined, after interviews with persons who had contact with Zack around the time of the murder, that the statutory mental mitigators did not apply and that Zack's actions around the time of the murder were more planned than spontaneous." *Id.*

Additionally, Dr. McClaren testified that he diagnosed Zack as having a personality disorder with prominent antisocial features. Dr. McClaren also testified that Zack had anger directed toward women.

Following the penalty phase, the jury voted to recommend the death sentence by eleven to one. The trial court imposed the death

sentence after finding six aggravators.[2]  The trial court also found

there were four mitigators, including that Zack committed the crime

while under an extreme mental or emotional disturbance and that

he lacked capacity to understand the criminality of his conduct.

But the trial court gave these mitigating circumstances little

weight.[3]

We affirmed Zack's conviction and death sentence on direct

appeal.  *Id.* at 26.  Zack's conviction and sentence became final on

October 2, 2000, when the United States Supreme Court denied

---

2.  The trial judge found the following six aggravating circumstances: (1) the defendant was convicted of a capital felony while under a sentence of felony probation; (2) the crime was committed in conjunction with a robbery, sexual battery, or burglary; (3) the defendant committed the crime to avoid lawful arrest; (4) the defendant committed the crime for financial gain; (5) the crime was especially heinous, atrocious, and cruel; and (6) the crime was committed in a cold, calculated, and premeditated manner.

3.  The trial court found that the following four mitigating circumstances were entitled to little weight: (1) the defendant committed the crime while under an extreme mental or emotional disturbance; (2) the defendant was acting under extreme duress; (3) the defendant lacked the capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law; and (4) nonstatutory mitigating factors of remorse, voluntary confession, and good conduct while incarcerated.

certiorari review. *Zack v. Florida*, 531 U.S. 858 (2000). Among the twelve issues raised on direct appeal, Zack launched no challenge to the jury's nonunanimous recommendation to impose the death sentence during the penalty phase, nor did he allege that he should be categorically exempt from execution under the Eighth Amendment.[4]

Zack filed his first postconviction motion in 2002. That same year, the United States Supreme Court decided two landmark death

---

4. Zack raised the following claims of error on direct appeal, alleging that the trial court erred by: (1) admitting similar fact evidence under *Williams v. State*, 110 So. 2d 654 (Fla. 1959); (2 & 3) denying a motion for judgment of acquittal on the sexual battery charge and on the robbery charge, respectively; (4) instructing the jury on felony murder based upon a burglary; (5) failing to consider all of Zack's mitigating evidence in the sentencing order; (6 & 7) finding two aggravators, that the murder was committed to avoid or prevent a lawful arrest and was committed in a cold, calculated, and premeditated manner, respectively; (8) using victim impact evidence; (9) admitting rebuttal evidence from Zack's former girlfriend, Candice Fletcher; (10) failing to give Zack's proposed instruction on sympathy; (11) retroactively applying the aggravating factor of a murder committed while on felony probation; and (12) refusing to admit a family photo during the penalty phase. *Zack I*, 753 So. 2d at 16 n.5. This Court agreed with Zack on claim (6), that the "prevent lawful arrest" aggravator was not established, but this Court concluded it was harmless error. This Court also agreed with Zack on claim (11), that the felony probation aggravator was not retroactive, but again, this Court concluded that it was harmless error, particularly in light of the other four aggravators that supported imposition of the death penalty.

penalty decisions: *Atkins v. Virginia*, 536 U.S. 304 (2002) (holding that the Eighth Amendment does not permit the execution of "mentally retarded" defendants),[5] and *Ring v. Arizona*, 536 U.S. 584 (2002) (holding that the Sixth Amendment requires a jury, not a sentencing judge alone, to find an aggravating circumstance necessary to impose the death penalty). Unsurprisingly, among Zack's six initial postconviction claims[6] were an *Atkins* and a *Ring* claim.

---

5. Before *Atkins* was decided, the Florida Legislature created section 921.137, Florida Statutes (2001), which prohibited the execution of "mentally retarded" defendants; i.e., a defendant with "significantly subaverage general intellectual functioning existing concurrently with deficits in adaptive behavior and manifested during the period from conception to age 18." Ch. 2001-202, § 1, Laws of Fla. "[S]ignificantly subaverage general intellectual functioning" was defined as meaning "performance that is two or more standard deviations from the mean score on a standardized intelligence test specified in the rules of the Department of Children and Family Services." *Id.* In 2006, the Legislature changed the responsible agency for the standardized intelligence test to the Agency for Persons with Disabilities. Ch. 2006-195, § 23, Laws of Fla. In 2013, the Legislature substituted the term "intellectual disability" for "mental retardation." Ch. 2013-162, § 38, Laws of Fla. Otherwise, the definitions have not been materially changed.

6. Zack's registry counsel raised six issues in his motion for postconviction relief: (1) whether counsel was ineffective for failing to object to DNA evidence and for failing to request a hearing under *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923); (2) whether the trial court erred in failing to sua sponte hold a *Frye* hearing; (3)

To establish his *Atkins* claim for his 2002 postconviction motion, Zack was evaluated by Brett Turner, Psy.D., who prepared a neuropsychological evaluation for collateral counsel during postconviction litigation. Dr. Turner performed a WAIS-III IQ test in 2002 that showed a current full-scale IQ of 79. Dr. Turner's written report also referred to a prior IQ test performed in 1980 when Zack was eleven years old, showing a full-scale IQ of 92. The postconviction court, however, relying on expert testimony from trial reflecting that Zack's IQ was 84 or 86, summarily denied Zack's *Atkins* claim because he did not meet the statutory definition of intellectually disabled. *Zack v. State* (*Zack II*), 911 So. 2d 1190,

---

whether trial counsel was ineffective for calling Zack to testify without preparing him for cross-examination or explaining to him that he had a choice whether to testify; (4) whether the death penalty is disproportionate due to Zack's possible brain dysfunction and mental impairment, both of which are in the same category as mental retardation and prohibit Zack's execution under *Atkins*; (5) whether trial counsel was ineffective in closing arguments to the jury; and (6) whether the sentence is unconstitutional pursuant to *Ring*. *Zack v. State* (*Zack II*), 911 So. 2d 1190, 1196 (Fla. 2005). The trial court summarily denied issues two, four, and six, but held an evidentiary hearing on issues one, three, and five. The trial court ultimately denied all postconviction relief.

1196 (Fla. 2005). The trial court also summarily denied his *Ring* claim.

Zack appealed the postconviction court's order in 2005 and raised five issues, including challenges to the trial court's summary denial of his *Atkins* and *Ring* claims.[7] Zack also filed a petition for writ of habeas corpus which was addressed in *Zack II*.[8] This Court affirmed the summary denial of Zack's *Atkins* claim in *Zack II*,

---

7. On postconviction appeal, Zack raised the following issues: (1) trial counsel's ineffectiveness for failing to challenge the State's DNA evidence; (2) trial counsel's ineffectiveness for failing to prepare Zack to testify at trial; (3) trial counsel's ineffectiveness in making prejudicial remarks to the jury in both opening statement and closing argument; (4) the postconviction court erred in summarily denying Zack's postconviction claims involving Zack's right to a *Frye* hearing and the constitutionality of the death sentence under *Atkins*; (5) that Florida's capital sentencing scheme is unconstitutional under *Ring*; and (6) postconviction counsel was ineffective. *Zack II*, 911 So. 2d at 1197.

8. In his habeas petition, Zack alleged that his appellate counsel was ineffective for failing to raise six claims on direct appeal: (1) that the State's peremptory challenge during jury selection was racially motivated; (2) that the prosecutor made impermissible arguments to the jury; (3) that the State impermissibly introduced nonstatutory aggravating factors; (4) that the trial court erred by admitting crime scene photos that were prejudicial and gruesome; (5) that the trial court erred by admitting evidence of other crimes; and (6) that the trial court erred by admitting irrelevant and prejudicial evidence. *Zack II*, 911 So. 2d at 1203.

noting that Zack did not meet the statutory criteria based even on his lowest IQ score of 79, and that *Atkins* claims should be raised in a motion filed under Florida Rule of Criminal Procedure 3.203. 911 So. 2d at 1201–02. As to Zack's *Ring* claim, this Court held, in part, that because *Ring* did not retroactively apply to cases that were already final when it was decided, *Ring* did not apply to Zack's sentence. *Id.* at 1203. Thus, this Court affirmed the postconviction court's order and denied Zack's petition for habeas relief. *Id.* at 1211.

We set out most of Zack's subsequent, successive postconviction history related to his intellectual disability claim in *Zack v. State* (*Zack III*):

> Zack filed a successive postconviction motion on December 1, 2004, raising an *Atkins* claim. The trial court denied the claim without an *Atkins* hearing, finding that after a review of the expert trial testimony none had found Zack's I.Q. to be near the required statutory figure of 70 in order to establish intellectual disability. This Court affirmed the trial court's denial [by order]. In its order, this Court relied on *Cherry v. State*, 781 So. 2d 1040 (Fla. 2000), and held that "Zack has not provided any new evidence of [intellectual disability] and previous evidence demonstrates that his I.Q. was well above the statutory figure of 70 or below." [*Zack v. State*, 982 So. 2d 1179 (Fla. 2007) (table).]
> On March 4, 2005, Zack filed a second petition for a writ of habeas corpus based upon the Supreme Court's

- 13 -

decision in *Crawford v. Washington*, 541 U.S. 36 (2004). This Court denied the petition on October 6, 2005. *Zack v. Crosby*, 918 So. 2d 240 (Fla. 2005).

Zack also filed a federal habeas petition that included an *Atkins* claim. *Zack v. Crosby*, 607 F.Supp.2d 1291 (N.D. Fla. 2008). All claims not based on *Atkins* were dismissed with prejudice as untimely. *Id.* at 1295. Zack's *Atkins* claim was denied with prejudice on the merits on March 26, 2009. In its order, the court found that the record refuted Zack's allegation that he is intellectually disabled and held that the record uniformly concluded that Zack's I.Q. was significantly above the minimum threshold for intellectual disability. The Eleventh Circuit, in an en banc opinion, affirmed the dismissal of many of the claims in the habeas petition as untimely. *Zack v. Tucker*, 704 F.3d 917 (11th Cir. 2013). The Supreme Court denied certiorari review on October 7, 2013. *Zack v. Crews*, [571 U.S. 863] (2013).

On May 26, 2015, Zack filed a second successive postconviction motion raising a claim of intellectual disability based on *Hall v. Florida*, [572 U.S. 701] (2014). The trial court summarily denied the motion on July 8, 2015.

228 So. 3d 41, 45–46 (Fla. 2017) (second alteration in original).

This Court affirmed the postconviction court's summary denial of the *Hall* claim in *Zack III*, explaining that Zack was unable to "present additional evidence of intellectual disability" because his "I.Q. test score falls within the test's acknowledged and inherent margin of error." *Id.* at 46 (quoting *Hall*, 572 U.S. at 723). As this Court further explained,

> At the *Huff* [*v. State*, 622 So. 2d 982 (Fla. 1993)] hearing, Zack presented his full range of scores, as well as evidence of adaptive deficits before age 18. The record demonstrates five I.Q. scores for Zack: a score of 92 in 1980 when Zack was 11 years old, and four scores after Zack turned 18—84 and 86 in 1997 at 27 years of age, 79 in 2002, and 80 in 2015. While a holistic hearing is required, defendants must still be able to meet the first prong of *Hall*. Because Zack's current score is well above 75, and there are no scores in his history below 75, it is unlikely that he would ever be able to satisfy the significantly subaverage intellectual functioning prong.

*Id.* at 47 (footnote omitted).

Zack also filed a successive habeas petition asserting that his death sentence is unconstitutional under *Hurst v. Florida*, 577 U.S. 92 (2016). *Zack III*, 228 So. 3d. at 47. This Court denied this claim in *Zack III*, holding that *Hurst* has been interpreted as an extension of *Ring* and does not apply retroactively to cases that were final before *Ring* was decided. *Id.* at 47–48. The United States Supreme Court denied certiorari review. *Zack v. Florida*, 138 S. Ct. 2653 (2018).

Nonetheless, Zack filed his third successive postconviction motion in 2017, raising five claims that were all dependent on the retroactive application of *Hurst*. *Zack v. State* (*Zack IV*), 43 Fla. L. Weekly S429 (Fla. Oct. 4, 2018). The postconviction court

- 15 -

summarily denied relief, holding that Zack's sentence was final before *Ring*, so *Hurst* did not retroactively apply to him. *Id.* at S429. This Court affirmed in 2018, *id.* at S430, and the United States Supreme Court denied certiorari review. *Zack v. Florida*, 139 S. Ct. 1622 (2019).

On August 17, 2023, Governor DeSantis issued a death warrant for the execution of Zack. The execution is scheduled for Tuesday, October 3, 2023, at 6:00 p.m. Zack timely filed his fourth successive postconviction motion raising two claims asserting that his execution is barred by the Eighth Amendment on the basis that (1) his FAS diagnosis is the functional equivalent of an intellectual disability, and (2) his penalty phase jury recommendation was not unanimous. The postconviction court summarily denied both claims, finding both to be untimely, procedurally barred, and meritless under this Court's recent *Dillbeck* decision. *See Dillbeck v. State*, 357 So. 3d 94 (Fla. 2023).

On appeal, Zack asserts that the postconviction court erred by summarily denying his fourth successive postconviction motion. We find no error and affirm.

## II. Analysis

"Summary denial of a successive postconviction motion is appropriate '[i]f the motion, files, and records in the case conclusively show that the movant is entitled to no relief.' " *Owen v. State*, 364 So. 3d 1017, 1022 (Fla. 2023) (quoting *Bogle v. State*, 322 So. 3d 44, 46 (Fla. 2021) (alteration in original)). The appropriate standard of review of "the circuit court's decision to summarily deny a successive rule 3.851 motion [is] de novo, accepting the movant's factual allegations as true to the extent they are not refuted by the record, and affirming the ruling if the record conclusively shows that the movant is entitled to no relief." *Id.* at 1022–23 (quoting *Walton v. State*, 3 So. 3d 1000, 1005 (Fla. 2009)).

It is also appropriate for a postconviction court to summarily dismiss claims raised in a successive postconviction motion that are untimely or procedurally barred. *See* Fla. R. Crim. P. 3.851(e)(2) ("A claim raised in a successive motion shall be dismissed if the trial court finds that it fails to allege new or different grounds for relief and the prior determination was on the merits; or, if new and different grounds are alleged, the trial court finds that the failure to assert those grounds in a prior motion constituted an abuse of the

procedure; or, if the trial court finds there was no good cause for failing to assert those grounds in a prior motion; or, if the trial court finds the claim fails to meet the time limitation exceptions set forth in subdivision (d)(2)(A), (d)(2)(B), or (d)(2)(C).").

With some exceptions, Florida Rule of Criminal Procedure 3.851(d) bars "[a]ny motion to vacate judgment of conviction and sentence of death" not filed "within 1 year after the judgment and sentence become final."[9] But there are three exceptions to raising postconviction claims outside of the one-year timeframe:

> (A) the facts on which the claim is predicated were unknown to the movant or the movant's attorney and could not have been ascertained by the exercise of due diligence, or
> (B) the fundamental constitutional right asserted was not established within the period provided for in subdivision (d)(1) and has been held to apply retroactively, or
> (C) postconviction counsel, through neglect, failed to file the motion.

Fla. R. Crim. P. 3.851(d)(2)(A)–(C).

---

9. Under rule 3.851(d)(1)(A) and (B), a judgment becomes final upon either "the expiration of the time permitted to file in the United States Supreme Court a petition for writ of certiorari seeking review of the Supreme Court of Florida decision affirming a judgment and sentence of death (90 days after the opinion becomes final)" or upon "the disposition of the petition for writ of certiorari by the United States Supreme Court, if filed."

## A. Extension of *Atkins*

In his first issue on appeal, Zack claims that the postconviction court erred by summarily denying his claim—that FAS is the functional equivalent of an intellectual disability under the Eighth Amendment and *Atkins*—as untimely, procedurally barred, and meritless. Finding no error, we agree and affirm.

### (1) Timeliness

The postconviction court found that Zack's claims were untimely filed under rule 3.851(d)(1), and that he improperly seeks to avoid this procedural bar under rule 3.851(d)(2) by asserting there is a new consensus—based on research articles and opinions—that FAS is now considered to be equivalent to an intellectual disability. The postconviction court is correct.

Zack's FAS claim meets none of the exceptions under rule 3.851(d)(2)(A)–(C). As demonstrated by the extensive history of Zack's postconviction and habeas proceedings, the facts upon which his intellectual disability claim is predicated have long been known to him and his attorneys. He has long known his IQ score range (the lowest score of 79 was established in 2002) and his experts' FAS diagnosis (relied on at trial in 1997). Yet, he relies on

this twenty-year-old-plus information to now claim he should be deemed intellectually disabled and, thus, categorically exempt from execution under *Atkins.* But Zack raises no newly discovered evidence on this point. *See Dillbeck,* 357 So. 3d at 99 ("[A]n intellectual disability claim that is based on newly discovered evidence must be filed 'within one year of the date upon which the claim became discoverable through due diligence.' ") (quoting *Pittman v. State,* 337 So. 3d 776, 777 (Fla. 2022)).

Zack instead cites to "new scientific consensus" found in several articles published in 2017 and 2021, though one was corrected in 2022.[10] Zack also offered a declaration from one of the article's authors, Natalie Novick Brown, Ph.D., who evaluated Zack and explained why FAS (which is the most severe form of Fetal

---

10.  There are three cited articles: (1) Stephen Greenspan, Natalie Novick Brown & William J. Edwards, *Determining Disability Severity Level for Fetal Alcohol Spectrum Disorder: Assessing the Extent of Impairment,* Evaluating Fetal Alcohol Spectrum Disorders in the Forensic Context (Springer, 2021; corrected, 2022); (2) Natalie Novick Brown & Stephen Greenspan, *Diminished Culpability in Fetal Alcohol Spectrum Disorders (FASD),* 2021 Behav. Sci. L. 1; and (3) Jerrod M. Brown, et al., *Fetal Alcohol Spectrum Disorders (FASD) and Competency to Stand Trial (CST),* 52 Int'l. J. L. & Psych. 19, 21–22 (2017).

Alcohol Spectrum Disorders (FASD)), is now recognized as being equivalent to an intellectual disability. She also explained why IQ scores, though relevant, are an "outmoded concept" for determining intellectual disability. But these articles and Dr. Novick Brown's declaration rely on older sources. Dr. Novick Brown's declaration notes that she helped promulgate this information within the legal community in 2012, through a resolution adopted by the American Bar Association that she helped author.

This Court has repeatedly held that " '[n]ew opinions or research studies based on a compilation or analysis of previously existing data and scientific information' are not generally considered newly discovered evidence." *Dillbeck*, 357 So. 3d at 99 (quoting *Henry v. State*, 125 So. 3d 745, 750 (Fla. 2013) (noting that "Dillbeck cites a 2021 article for the proposition that the medical and scientific community view ND-PAE as equivalent to intellectual disability, and that article in turn relies on older sources")). And this Court has found "new scientific consensus" to be an unpersuasive reason to restart the clock for purposes of timely filing successive postconviction claims. *Barwick v. State*, 361 So. 3d 785, 793 (Fla. 2023) (affirming summary denial of a successive

- 21 -

postconviction Eighth Amendment claim as untimely because "the APA resolution does not constitute newly discovered evidence such that it creates an exception to the one-year time limitation for filing postconviction claims"); *Sliney v. State*, 362 So. 3d 186, 189 (Fla. 2023) (affirming summary denial of a successive postconviction Eighth Amendment claim seeking to expand *Roper v. Simmons*, 543 U.S. 551 (2005), based on a new scientific consensus regarding brain development as untimely).

Additionally, as to the second timeliness exception, Zack cited to no new case announcing a newly recognized, retroactive fundamental constitutional right establishing that FAS is the functional equivalent of an intellectual disability. Rather, it appears Zack improperly sought to have a new fundamental constitutional right recognized in his successive rule 3.851 motion. *See Carroll v. State*, 114 So. 3d 883, 886 (Fla. 2013) (holding that Caroll's claim that *Atkins* should be extended to mentally ill persons is a claim "seeking . . . recognition of a new fundamental constitutional right, which is not properly pled under rule 3.851(d)(2)(B)").

Finally, Zack's postconviction counsel throughout the years certainly have not neglected to raise some form of his current claim,

- 22 -

that FAS is equivalent to an intellectual disability under *Atkins* and bars his execution. Thus, because Zack meets none of the exceptions to the timeliness requirement set forth in rule 3.851(d)(2)(A)–(C), the postconviction court did not err in finding this claim to be untimely.

## (2) Procedural Bar

The record supports the postconviction court's conclusion that Zack's claim is procedurally barred. Zack has repeatedly raised some variation of the claim he now raises, that FAS is the functional equivalent of an intellectual disability under *Atkins* and the Eighth Amendment. As noted by the postconviction court's order, Zack's FAS intellectual disability claim was raised and decided against him in 2002, *see Zack II*, 911 So. 2d at 1202 (affirming denial of *Atkins* claim); in 2004, *see Zack*, 982 So. 2d 1179 (unpublished order affirming summary denial of *Atkins* claim where Zack presented no new evidence of intellectual disability); in 2015, *see Zack III*, 228 So. 3d at 47 (affirming denial of *Atkins* claim raised in light of *Hall*); and in 2017, *see Zack IV*, 43 Fla. L. Weekly at S429 (affirming denial of claim pertaining to "a jury finding of intellectual disability" in light of *Hurst*).

Though Zack's latest claim that FAS is equivalent to an intellectual disability is grounded in "new scientific consensus" and "evolving standards of decency," this Court recently reiterated in *Barwick* that "using 'a different argument to relitigate the same issue' . . . is inappropriate." *Barwick*, 361 So. 3d at 793 (quoting *Medina v. State*, 573 So. 2d 293, 295 (Fla. 1990)). In *Barwick*, this Court found Barwick's claim that he should be "exempt from execution due to his mental deficiencies" was, at its core, the same claim he'd previously raised three times and was, thus, procedurally barred. *Id.* at 795 ("Thus, the instant claim is a variation of claims that were raised in prior proceedings, and as such, is procedurally barred."). Like Barwick's, Zack's claim that he should be exempt from execution under the Eighth Amendment due to his FAS diagnosis is, at its core, the same claim he's repeatedly raised since 2002. Thus, the postconviction court did not err in concluding that this claim is procedurally barred.

Further, "[e]ven if this claim had not been raised in a prior proceeding, it is still procedurally barred because it could have been raised previously." *Id.*; *see also Branch v. State*, 236 So. 3d 981, 986 (Fla. 2018) (holding that an extension-of-*Roper* claim was

- 24 -

procedurally barred in an active warrant case because it could have been raised previously); *Simmons v. State*, 105 So. 3d 475, 511 (Fla. 2012) (rejecting as procedurally barred a claim, based on *Roper* and *Atkins*, that the defendant was exempt from execution based on mental illness and neuropsychological deficits because it could have been raised in prior proceedings). "Evolving standards of decency" arguments in the Eighth Amendment context have long been recognized. *See Trop v. Dulles*, 356 U.S. 86, 100–01 (1958) ("The basic concept underlying the Eighth Amendment is nothing less than the dignity of man. . . . The Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society."); *Atkins*, 536 U.S. at 311–12 (quoting *Trop*, 356 U.S. at 100–01). And Zack's own exhibits to his fourth successive postconviction motion reflect that the medical consensus for forensically evaluating FAS as an intellectual disability was widely accepted as early as 2018 or 2019.

Thus, the postconviction court did not err in finding this claim to be procedurally barred.

### (3) Merits

Finally, even if timely and not procedurally barred, Zack's claim is meritless as recognized in this Court's recent active warrant decisions in *Dillbeck* and *Barwick*. In both *Dillbeck* and—in reliance on *Dillbeck*—*Barwick*, this Court rejected similar "extension-of-*Atkins*" claims because this Court has "long held that the categorical bar of *Atkins* that shields the intellectually disabled from execution does not apply to individuals with other forms of mental illness or brain damage." *Dillbeck*, 357 So. 3d at 100 (citing *Gordon v. State*, 350 So. 3d 25, 37 (Fla. 2022) ("For the purposes of the Eighth Amendment, the existence of a traumatic brain injury does not reduce an individual's culpability to the extent they become immune from capital punishment.")); *Barwick*, 361 So. 3d at 795 (rejecting as untimely, procedurally barred, and meritless a claim that the protections of *Atkins* as well as *Roper* should be extended); *see also Carroll*, 114 So. 3d at 887 (rejecting as untimely, procedurally barred, and meritless a claim that the protections of *Atkins* and *Roper* should be extended to a defendant who is less culpable as a result of mental illness); *Simmons*, 105 So. 3d at 511 (rejecting a claim that persons with mental illness must be treated

- 26 -

similarly to those with intellectual disability due to reduced culpability); *Lawrence v. State*, 969 So. 2d 294, 300 n.9 (Fla. 2007) (rejecting a claim that the Equal Protection Clause requires an extension of *Atkins* to the mentally ill due to their reduced culpability).

And as recognized by *Barwick*, this Court lacks the authority to extend *Atkins* to individuals who "are not intellectually disabled as provided in *Atkins*." *Barwick*, 361 So. 3d at 795. This Court must interpret Florida's prohibition against cruel and unusual punishment in conformity with decisions of the United States Supreme Court under the conformity clause in article I, section 17 of the Florida Constitution.[11] *Id.* "This means that the Supreme Court's interpretation of the Eighth Amendment is both the floor and the ceiling for protection from cruel and unusual punishment in Florida . . . ." *Id.* at 794. "[A]nd this Court cannot interpret

---

11. The conformity clause in article I, section 17 states, "The prohibition against cruel or unusual punishment, and the prohibition against cruel and unusual punishment, shall be construed in conformity with decisions of the United States Supreme Court which interpret the prohibition against cruel and unusual punishment provided in the Eighth Amendment to the United States Constitution."

- 27 -

Florida's prohibition against cruel and unusual punishment to provide protection that the Supreme Court has decided is not afforded by the Eighth Amendment." *Id.* Supreme Court precedent "has limited the categorical ban announced in *Atkins* so that individuals with mental deficiencies other than intellectual disability are outside the scope of that ban." *Id.* at 795.

Because Florida Courts lack the authority to extend *Atkins* to Zack, who is not "intellectually disabled as provided in *Atkins*," *id.*, the postconviction court properly denied this claim as meritless.

### B. Nonunanimous Penalty Phase Jury Recommendation

The postconviction court concluded that Zack's second claim, that his nonunanimous death recommendation by the jury during his penalty phase violates the Eighth Amendment, is untimely, procedurally barred, and meritless. Again, the postconviction court committed no reversible error.

### (1) Timeliness

As noted under Issue I, Zack cannot meet any of the timing exceptions under rule 3.851(d)(2)(A)–(C) for raising the claim that his nonunanimous penalty phase verdict violates the Eighth Amendment. Zack has clearly known about the jury's

nonunanimous recommendation since his 1997 penalty phase, but he raised no challenge to it in his direct appeal. He did raise this issue in his initial postconviction motion, after *Ring* was decided in 2002. But in 2005, this Court affirmed the trial court's denial of Zack's *Ring* claim, holding that *Ring* did not retroactively apply to Zack's sentence because it was already final when *Ring* was decided. *Zack II*, 911 So. 2d at 1203. Zack raised this claim again in a state habeas petition after *Hurst* was decided in 2016. But in 2017, noting that *Hurst* is an extension of *Ring*, this Court denied his petition, holding that Zack is not covered by *Hurst* because *Hurst* does not retroactively apply to cases that were final before *Ring*. *See Zack III*, 228 So. 3d at 47–48. Nonetheless, Zack filed another successive postconviction motion in 2018 raising multiple *Hurst*-based claims premised on *Hurst* being retroactive. This Court, again, affirmed the postconviction court's denial of these claims, holding that, as a matter of law, Zack was not entitled to relief and had provided no compelling argument for reconsideration of the Court's prior rulings. *Zack IV*, 43 Fla. L. Weekly at S429.

Now in his fourth successive postconviction motion, Zack presents nothing constituting an exception to the one-year

timeframe. He cites neither to newly discovered evidence nor a case setting forth a newly established and retroactive fundamental constitutional right on this point. He instead raises an "evolving standards of decency" argument and alleges that Florida—along with Alabama—is a jurisdictional outlier in failing to require a unanimous jury recommendation for death. But this argument is nothing new and could have been raised in Zack's direct appeal. *See Spaziano v. Florida*, 468 U.S. 447, 463–65 (1984) (considering whether Florida's capital sentencing scheme offended the "contemporary standards of fairness and decency" by looking at sentencing schemes in other jurisdictions).

Zack attempts to establish that his "evolving standards of decency" claim is timely in light of *Hurst* and the Florida Legislature's adoption of a less than unanimous jury recommendation in 2023. *See* ch. 2023-23, § 1, Laws of Fla. (amending section 921.141(2)(c) and 921.141(3)(a)2., Florida Statutes (2022), which required a unanimous jury recommendation, to permit trial courts to impose a death sentence if at least eight jurors recommend a sentence of death) (effective April 20, 2023). But neither applies to Zack. When Zack was sentenced in 1997, a

unanimous jury recommendation for death was not required. *See* § 921.141(2), Fla. Stat. (1996) (requiring that the jury render an advisory sentence to the trial court, including whether defendant should be sentenced to life or death). And *Hurst v. State*, 202 So. 3d 40, 59 (Fla. 2016)—which was abrogated in part by *State v. Poole*, 297 So. 3d 487, 504 (Fla. 2020)—was never held to retroactively apply to Zack because *Ring* did not retroactively apply to Zack. *See Zack III*, 228 So. 3d at 47–48.

Accordingly, there is no error in the postconviction court's conclusion that this claim is untimely.

### (2) Procedural Bar

Further, there is no error in the postconviction court's conclusion that this claim is procedurally barred. As already noted, Zack has repeatedly raised the claim that his nonunanimous jury recommendation for death violates the Eighth Amendment. *See Zack II*, 911 So. 2d at 1203 (rejecting *Ring* claim); *Zack III*, 228 So. 3d at 47–48 (rejecting *Hurst* claim); *Zack IV*, 43 Fla. L. Weekly at S429–S430 (rejecting *Hurst* claim).

To avoid this bar, Zack's current iteration of his claim rests on an "evolving standards of decency" argument. But as noted

already, "evolving standards of decency" arguments in the Eighth Amendment context have long been recognized, *see Trop*, 356 U.S. at 100–01; *Spaziano*, 468 U.S. at 465, and Zack could have raised this claim on direct appeal. Further, though meritless, Zack's argument that juries were required to sentence defendants to death at the time of the Eighth Amendment's adoption in 1791 was certainly an argument he could have discovered by the time of his trial 200 years later and raised on direct appeal.

Thus, the postconviction court did not err in finding this claim to be procedurally barred.

### (3) Merits

Even if timely and not barred, to the extent Zack frames this issue as one of "evolving standards of decency" under the Eighth Amendment, this Court rejected precisely the same argument in *Dillbeck*. In *Dillbeck*, this Court explained that a nonunanimous jury challenge is meritless because "we are 'bound by Supreme Court precedents that construe the United States Constitution,' and the Supreme Court's precedent establishes that the Eighth Amendment does not require a unanimous jury recommendation of death." 357 So. 3d at 104 (quoting *Poole*, 297 So. 3d at 504). This

Court further explained in *Dillbeck* that "[t]he Supreme Court 'rejected the exact argument . . . that the Eighth Amendment requires a unanimous jury recommendation of death' in *Spaziano*," *id.* (quoting *Poole*, 297 So. 3d at 504), and that "*Spaziano* is still good law." *Id.* at 104.

In *Poole*, this Court overturned its earlier precedent in *Hurst v. State*, which held "that the Eighth Amendment requires a unanimous jury recommendation of death." 297 So. 3d at 504. In so doing, *Poole* clarified that *Ring* and *Hurst* were Sixth Amendment cases that had "nothing to do with jury sentencing." *Id.* (quoting *Ring*, 536 U.S. at 612, (Scalia, J., concurring)). Further, *Poole* found that *Hurst v. State* erred in holding that "the Eighth Amendment requires a unanimous jury recommendation of death" because "[t]he Supreme Court rejected that exact argument in *Spaziano*." *Id.* "The Constitution permits the trial judge, acting alone, to impose a capital sentence." *Id.* (quoting *Harris v. Alabama*, 513 U.S. 504, 515 (1995)). "We are bound by Supreme Court precedents that construe the United States Constitution." *Id.*

Because the Supreme Court's Eighth Amendment precedent to which we are bound does not require a unanimous jury

recommendation for death during the penalty phase, the postconviction court properly found this claim to be meritless.

## III. Conclusion

We affirm the summary denial of Zack's fourth successive motion for postconviction relief. We also deny his motions for stay of execution and for oral argument. No motion for rehearing will be entertained by this Court. The mandate shall issue immediately.

It is so ordered.

MUÑIZ, C.J., and CANADY, COURIEL, GROSSHANS, and SASSO, JJ., concur.
LABARGA, J., concurs in result.

An Appeal from the Circuit Court in and for Escambia County,
     Linda L. Nobles, Judge
     Case No. 171996CF002517XXXAXX

Robert Friedman, Capital Collateral Regional Counsel, Dawn B. Macready, Assistant Capital Collateral Regional Counsel, and Stacy R. Biggart, Assistant Capital Collateral Regional Counsel, Northern Region, Tallahassee, Florida,

     for Appellant

Ashley Moody, Attorney General, Charmaine M. Millsaps, Senior Assistant Attorney General, and Jason W. Rodriguez, Assistant Attorney General, Tallahassee, Florida,

     for Appellee